1  DARIN SNYDER (S.B. #136003)
   dsnyder@omm.com
2  O'MELVENY & MYERS LLP
   Two Embarcadero Center, 28th Floor
3  San Francisco, California 94111-3823
   Telephone:   (415) 984-8700
4  Facsimile:   (415) 984-8701

5  ERIC AMDURSKY (S.B. #180288)
   eamdursky@omm.com
6  O'MELVENY & MYERS LLP
   2765 Sand Hill Road
7  Menlo Park, California  94025-7019
   Telephone:   (650) 473-2600
8  Facsimile:   (650) 473-2601

9  Attorneys for Plaintiff
   Zynga Inc.
10

11                **UNITED STATES DISTRICT COURT**

12               **NORTHERN DISTRICT OF CALIFORNIA**

13                        **SAN FRANCISCO**

14

15 | ZYNGA INC.,                          | Case No.
16 |                         Plaintiff,   | **COMPLAINT FOR**
17 |         v.                           | **1.  MISAPPROPRIATION OF TRADE SECRETS (SCOPELY AND MAIETTI)**
18 | SCOPELY, INC., a Delaware Corporation, MASSIMO MAIETTI, an
19 | individual, and EHUD BARLACH, an individual, | **2.  BREACH OF WRITTEN CONTRACT (MAIETTI)**
20 |                         Defendants.   | **3.  BREACH OF WRITTEN CONTRACT (BARLACH)**
21
22                                          **4.  TORTIOUS INTERFERENCE WITH CONTRACT (SCOPELY)**
23                                          **JURY TRIAL DEMANDED**
24

25

26

27

28

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

Plaintiff Zynga Inc. ("Zynga") alleges the following against Defendants Scopely, Inc. ("Scopely"), Massimo Maietti ("Maietti"), and Ehud Barlach ("Barlach") (collectively, "Defendants"):

## NATURE OF THE CASE

1.     Zynga is a leader in the mobile and online social game industry.  Its *FarmVille* and *FarmVille2* games have been played by more than 400 million people, and its *Words With Friends* game is the world's most popular mobile word game with more than 55 million matches being played at any moment.  Zynga has released numerous other successful games, including *CityVille, CastleVille, FarmVille2: Country Escape, Zynga Poker,* and *Mafia Wars*, and it continues to devote significant time and resources into the development of new games to promote to its broad and deep customer base.

2.     The social gaming industry is highly competitive, and not just in attracting players in the marketplace to a particular game, but in recruiting, hiring and developing top talent who know how to design and develop hit games.  Zynga respects the rights of its employees to resign and seek employment with other companies.  But Zynga cannot tolerate the wholesale theft of some of its most sensitive and commercially valuable data, or a competitor that competes unfairly by not respecting, and even encouraging the breach of, the contractual obligations of Zynga's current and former employees.  Zynga has no choice but to bring this lawsuit to recover its stolen data, ensure no use is made of it, and to curb the knowing and deliberate unlawful conduct of a direct competitor.

3.     Prior to going to work for Scopely, Maietti worked for Zynga as a senior level game designer on some of Zynga's most popular existing games and important upcoming games.  For over a year before he left, Maietti was the Creative Director on one of Zynga's most ambitious soon-to-be released games, which goes by the code name "Project Mars."  Maietti is under a contractual obligation with Zynga to keep Zynga's information confidential and re-affirmed upon his exit

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

1   interview that he was not taking any Zynga confidential information with him.

2       4.    Forensic analysis conducted on Maietti's Zynga-issued computer

3   revealed that Maietti did not abide by his contractual obligations to Zynga.  On July

4   4, 2016 – during the Independence Day holiday and just one day before he gave

5   notice of his resignation of employment from Zynga – Maietti's Internet history

6   shows that Maietti used the Google Chrome browser on his Zynga-issued laptop to

7   access a Zynga-owned Google Drive account.  His browser history shows that he

8   proceeded to download ten Google Drive folders that he had permission to access,

9   but only as necessary to perform his duties for Zynga.  The Google Chrome

10  browser "zipped" those ten files and downloaded them to his File Downloads

11  folder.  Once downloaded, forensic analysis shows that Maietti copied nine of those

12  folders to a connected external USB device.  The external USB device was

13  disconnected from the computer, and Maietti then placed the zip files in the Trash,

14  while they remained on the USB device.  On July 7, 2016, over 20,000 files and

15  folders were located within the Trash but were subsequently deleted in a failed

16  attempt by Maietti to cover his tracks.

17      5.    The nine zipped folders taken by Maietti have identical names to those

18  in Zynga's Google Drive account, but Maietti appended the date those files were

19  stolen to the name of each folder.  An analysis of the corresponding Google Drive

20  folders reveals that Maietti took over 14,000 files and approximately 26 GB of

21  extremely sensitive, highly confidential Zynga information.

22      6.    Particularly egregious was Maietti's apparent wholesale copying of the

23  Project Mars folder.  This folder contains the work of the entire Project Mars team

24  in developing a game that pushes the standards of social gaming to a new

25  level.  Project Mars introduces complex gameplay interactions and systems built

26  upon cutting-edge, revolutionary technology developed over the past 18 months by

27  a team of engineers, artists, and product managers.

28

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

7.     Other files contained in the zip folders taken by Maietti include:

- Hundreds of detailed design specifications for features that drove engagement and revenue within some of Zynga's most popular games, including *Farmville 2* and *CastleVille*, such as features of the week ("FOTW"), bold beats, and limited edition ("LE");

- Unreleased game design documents that describe material features and game play, pitches, conceptual renderings of characters and scenes, mock-ups of game play and related information;

- Compilations of various Zynga learnings, including "best practices" for game design and team management, and detailed process documents relating to feature development and release;

- Numerous documents summarizing and analyzing the results of game play tests with feedback on which features were positively received and which need improvement and why; and

- Financial-related information, including how different features and mechanics have performed.

8.     Scopely has similarly shown a complete disregard for Zynga's intellectual property and the contractual obligations of Zynga's current and former employees.  Prior to going to work for Scopely, Barlach worked for Zynga as its General Manager of *Hit It Rich! Slots* ("*Hit It Rich!*").  During his employment, Barlach was contractually obligated not to "directly or indirectly solicit away employees or consultants" of Zynga.  Forensic examination of Barlach's Zynga-issued computer revealed that when Barlach accepted Scopely's offer of employment, he also offered to help Scopely raid Zynga's workforce.  Scopely responded:

"Thanks!!  I was saving that for your first day! LOL I would be happy to hear about anyone you think I should be trying to speak with. Obviously I know you have the clause about not taking people so I am

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

always careful ☺"  (Smiling emoji included in original text.)

9.      Knowing about Barlach's obligations to Zynga, Scopely should have responded that it had no interest in Barlach violating his commitments.  Instead, Scopely responded by "laughing out loud" and admitting that, if Barlach had not offered to violate his contractual obligations to Zynga, Scopely would have asked him to do so on his very first day.

10.      Scopely made good on Barlach's offer of assistance.  Around the time Barlach resigned, Scopely solicited two other key players in Zynga's Slots group, Chuck Hess ("Hess"), Chief Technology Officer, Slots, and Matthew Copeland ("Copeland"), Divisional Executive Producer, Slots, and also hired Derek Heck ("Heck"), a Product Manager of *Wizard of Oz Slots* and *Willy Wonka Slots*, and Evan Hou ("Hou"), a Manager, Data Analytics who was embedded on the *Hit It Rich!* team.  Indeed, Hou was solicited by Scopely no later than September 6, 2016, the first business day after Barlach's employment at Zynga ended.

11.      It is now clear that Scopely's employee raiding efforts did not start with Barlach.  The day after Maietti signed a Termination Certification in which Maietti agreed not to "directly or indirectly, solicit, induce, recruit or encourage any of [Zynga's] employees to leave their employment," Scopely's Chief People Officer, Jessica Neal ("Neal") contacted and solicited a Zynga Lead Product Manager, Joshua Park ("Park"), who had worked closely with Maietti for a period of time on *FarmVille 2*.  When Park attended his interviews with Scopely at its headquarters in Los Angeles, his first interview was with Maietti, who encouraged Park to leave Zynga for Scopely.  During Park's interviews, a Scopely executive also questioned Park on Zynga's future plans for one of its biggest games, *Words with Friends*, a socially interactive game on which Scopely road the coattails with spinoffs *Yahtzee® with Buddies* and *Dice with Buddies™*.

12.      Further discovery is needed to investigate the extent of Scopely's employee raiding efforts and intentional interference with Zynga's contracts, as

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

well as other suspicious computer activity by several key Zynga employees who have joined Scopely since July 2016, including Heck and Hou.  Forensic analysis has revealed that Barlach, Heck, and Hou all attached external USB devices to their Zynga-issued laptop computers in the weeks before resigning to go to work for Scopely.  Heck also deleted more than 24,000 files and folders in the last month of his employment with Zynga, and referenced articles entitled, "How to erase my hard drive and start over" and "How to Erase a Computer Hard Drive - How To Articles."

13.     Zynga is informed and believes that Maietti, Barlach, Hou, and Heck currently work for Scopely in similar roles to their prior positions at Zynga.  The data taken from Zynga could be used not only to improve Scopely's directly-competing socially interactive games, but also to undermine Zynga's release of Project Mars, and to improve Scopely's understanding of Zynga's game mechanics, monetization techniques, and business model.

14.     Upon learning of these facts, Zynga promptly brought this lawsuit seeking judicial relief.  When Maietti first resigned in July, he reaffirmed in writing that he had returned all of Zynga's trade secrets and would not solicit its employees.  At that time, Zynga had no reason to believe that its rights were being violated.  Similarly, Barlach concealed the fact that he had accepted a position with Scopely for nearly a month after he signed an offer letter, leaving Zynga unaware of the pattern emerging before it.

15.     But as soon as Zynga realized that its key talent was being solicited and hired by Scopely with increasing frequency, Zynga commissioned a forensic examination of the departed employees' computers, going back to Maietti's resignation months earlier.  Then and only then did Zynga begin to learn the extent of Defendants' wrongdoing.  To protect its most valuable intellectual property and to put a stop to Defendants' wrongful course of conduct, Zynga immediately filed this lawsuit.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction over Zynga's claim under the federal Defend Trade Secrets Act pursuant to 18 U.S.C. § 1836 and over Zynga's supplemental state-law claims pursuant to 28 U.S.C. § 1367.

17.     Venue is proper in this Court under 28 U.S.C. § 1391(a) because a substantial part of the events that gave rise to Zynga's claims took place within the District, Defendants' tortious conduct was directed at this District, and because Zynga was injured by Defendants' tortious conduct committed in this District.

## THE PARTIES

18.     Plaintiff Zynga is a Delaware corporation and has its principal place of business in San Francisco, California.

19.     Zynga is informed and believes, and thereupon alleges, that Defendant Scopely, Inc. is a Delaware corporation with its principal place of business at 3530 Hayden Avenue A, Culver City, California.

20.     Zynga is informed and believes, and thereupon alleges, that at all times relevant to this Complaint, Defendant Massimo Maietti was, and continues to be, a resident of San Francisco and Los Angeles Counties, in the State of California.

21.     Zynga is informed and believes, and thereupon alleges, that at all times relevant to this Complaint, Defendant Ehud Barlach was, and continues to be, a resident of San Francisco and Los Angeles Counties, in the State of California.

22.     Each Defendant has willfully aided and abetted each of the other Defendants in the wrongful concerted action described herein, or acted with or in furtherance of that action, or assisted in carrying out its purposes alleged in this Complaint.

23.     Defendants, and each of them, are individually sued as participants and aiders and abettors in the wrongful conduct complained of herein, and the liability of each arises from the fact that each has engaged in all or part of the improper acts, plans, schemes, conspiracies, or transactions complained of herein.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

# FACTUAL BACKGROUND

**A.**    **Zynga Is A Leader Of The Social Gaming Industry.**

24.    Founded in 2007, Zynga is one of the world's leading social gaming companies and a top developer of game applications for mobile devices and the world's most popular social networking sites. Zynga makes and distributes a variety of online social games, which are played simultaneously by millions of users.

25.    Over the course of many years, and at substantial expense, Zynga has developed and maintained significant amounts of highly confidential information that is proprietary to it, including without limitation, data related to its methodologies for creating, developing, and optimizing online social games, unreleased games, new game ideas, strategic roadmaps, feature designs, user feedback, monetization plans and efforts, statistical data gathering and metrics, confidential revenue data, negative knowledge based on trial and error, and sensitive personnel data.

26.    Zynga's most valuable property is its intellectual property, and specifically, the computer code and other digital assets that make its games function. Zynga's games are distributed digitally over the internet and constantly updated, tuned, and improved to engage its users. And if, as here, the building blocks of those games are copied, it would permit a competitor (like Scopely) to create knock-off copies of Zynga's products at a fraction of the cost, undercutting Zynga's position in the market and providing an unjust competitive boost to the perpetrators.

27.    Because of the highly competitive nature of the online social gaming industry, and because Zynga needs to maintain its competitive position through the protection of its sensitive business data, Zynga takes reasonable steps to ensure that its confidential business data is protected.

B.   **Scopely Is A Competitor Of Zynga In The Online Gaming Industry.**

28.   Founded in 2011, Defendant Scopely creates social games similar to those created by Zynga, including *Yahtzee® with Buddies* and *Dice with Buddies™*, that seemingly rode to success on the back of Zynga's highly successful socially interactive game, *Words with Friends*.  Based in Los Angeles, Scopely touts itself as "the #2 fastest growing tech company in America," and claims to "bring[] together the brightest minds across gaming and entertainment."  Scopely's bright minds, however, were not developed by Scopely.  They are coming from Zynga improperly, along with the company's trade secrets, confidential, and proprietary information.

C.   **Defendant Maietti Was Contractually Obligated To Protect Zynga's Confidential, Proprietary, And Trade Secret Information, And To Return That Information Upon The Termination Of His Employment.**

29.   In January 2011, Zynga hired Maietti as a Game Designer.  In his roles, Maietti occupied a special position of trust and confidence within Zynga, which included intimate involvement in some of Zynga's most successful and highly-anticipated games, including *FarmVille 2* and Project Mars.

30.   *FarmVille2* was released in 2012 and is one of Zynga's most successful and profitable games.  Between 2012 and 2015, Maietti was a Lead Designer and Director of Design of *FarmVille 2*, responsible for designing new features and content to be released in the game.  In 2014, Zynga released several "bold beats" meant to attract and retain users to the game by releasing upgrades and new features on a quarterly basis.  During his work on *FarmVille 2*, Maietti was the creative lead for multiple bold beats, significantly contributing to the game's overall success that year.  After working on *FarmVille 2*, Maietti transitioned to work on a new project, and was assigned to join the Project Mars team as its Creative Director.

31.     On Project Mars, Maietti was primarily responsible for the creative direction of the game, as well as supervising and managing the entire design team. Project Mars is not simply another Zynga game; it is a cutting edge, highly-anticipated newest iteration of one of Zynga's most successful interactive social games, which Zynga expects will change the standards of social gaming throughout the industry when it is released.

32.     In connection with his position at Zynga, Maietti was provided with access to Zynga's confidential, proprietary, and trade secret information related to Zynga's existing, and yet-to-be released games, including Project Mars.  As a condition of his employment, therefore, Maietti executed an Employment Invention Assignment and Confidentiality Agreement ("EIACA"), which provides, in pertinent part, that:

      a) Maietti "understand[s] that [his] employment by the Company creates a relationship of confidence and trust with respect to any information of a confidential or secret nature that may be disclosed to [him] by the Company . . . and that the Company has taken reasonable measures under the circumstances to protect from unauthorized use or disclosure";

      b) Maietti agreed that the information protected by the EIACA ("Proprietary Information") includes, among other things, "game information, [including] features, roadmaps, plans, specifications, mechanics, designs, costs and revenue," "techniques and methods for developing, coding, or improving online social games;" "measurement techniques, and specific functionality that increases monetization and both measures and increases retention metrics," "non-public financial information, which may include revenues, profits, margins, forecasts, budgets and other financial data," "marketing and advertising plans, strategies, tactics, budgets and studies; . . . business and operations

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

strategies," "research and development plans," and "employment and personnel information";

c) Maietti agreed that he would "[a]t all times, both during [his] employment and after its termination, . . . keep and hold all such Proprietary Information in strict confidence and trust . . . [and not] . . . use, disclose, copy, reverse-engineer, distribute, gain unauthorized access or misappropriate any Proprietary Information without the prior written consent of the Company except as may be necessary to perform [his] duties as an employee of the Company for the benefit of the company";

d) Maietti agreed that he would, "[u]pon termination of [his] employment with the Company, . . . promptly deliver to the Company all documents and materials of any nature or form, in [his] possession, custody or control, pertaining to [his]work with the Company and, upon Company request, will execute a document confirming [his] agreement to honor [his] responsibilities contained in this Agreement";

e) Maietti agreed that "in the event of a breach or threatened breach of this Agreement by [him] the Company may suffer irreparable harm and will therefore be entitled to injunctive relief to enforce this Agreement"; and

f) Maietti agreed that "for a period of one (1) year [after his employment ends, he] will not directly or indirectly solicit away employees or consultants of the Company for [his] own benefit or for the benefit of any other person or entity."

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

**D.**   **Shortly Before His Departure From Zynga, Maietti Copied Nine Zip Files To A USB Drive, Downloaded A Complete Working Version of Project Mars, And Accessed Over 13,000 Files Containing Zynga's Trade Secrets, Confidential, And Proprietary Information.**

33.   Zynga is informed and believes, and thereupon alleges, that by early May 2016, and likely earlier, Maietti was being recruited by and was considering employment with Scopely.

34.   On July 6, 2016, Maietti signed an offer letter, officially accepting employment with Scopely.  Before leaving Zynga, on June 24 and June 28, 2016, Maietti downloaded a Mac-usable working version of the Project Mars social game, which was nearly complete at that time.  A person with access to this file could then load and play the game on a Mac computer, or decompile and access the client-side source code for the game.  Maietti would have had no work-related purpose for downloading a Mac-usable working version of the game.

35.   On July 4, 2016 – a holiday – just one day before he provided notice of his resignation to Zynga and after he accepted employment with Scopely, Maietti connected an external USB device to his Zynga-issued laptop, ran a Google search for how to "download a google drive folder," and minutes later copied nine zip files containing Zynga's trade secrets, and confidential, and proprietary information.  These nine zip files included file names that are identical to files in Zynga's Google Drive account (other than the addition of the date on which Maietti downloaded them), including:

(1) Project_Mars-2016-07-04;

(2) FV2-2016-07-04;

(3) FtV2-2016-07-04;

(4) Farm_2_-_LE_and_Feature_Content-2016-07-04;

(5) CastleVille-2016-07-04;

(6) CastleVille_Documentation-2016-07-04;

(7) ArcadeVille-2016-07-04;

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

1      (8) Z-Platform-2016-07-04; and

2      (9) SDP's - 2016-07-04.

3      36.     Some of the game files Maietti took were projects on which Maietti

4  worked and had significant responsibility in designing the games, including Project

5  Mars and *FarmVille2*.  Some of the games have been released to the public and

6  some have not.

7      37.     Zynga is informed and believes, and thereupon alleges, that Maietti

8  took nearly every file Zynga had in its possession related to Project Mars, including

9  but not limited to, user concepts, theme testing, art exploration, core design,

10  promotional materials, and feedback surveys.  With these essential building blocks

11  and templates, a knowledgeable team could replicate a working version of the entire

12  game—or a knock-off version, as Scopely has been known to do—which has taken

13  Zynga 18 months and significant investment and resources to create.

14      38.     Maietti's actions on the morning of July 4th speak for themselves:

15          • 9:01 a.m. - External USB device connected to laptop

16          • 9:04 a.m. - Google search for "download a google drive folder"

17          • 9:06 a.m. - Zip files downloaded to laptop

18          • 9:20 a.m. - Zip files copied onto external USB device

19          • 10:18 a.m. – Original Zip files placed in Trash (but not the copies

20             Maietti created on his USB device)

21      39.     Maietti had no legitimate business purpose to copy the contents of

22  these folders, containing over 14,000 files relating to design, marketing, and

23  development of Zynga games.

24      40.     Zynga is informed and believes, and thereupon alleges, that Maietti not

25  only retained this data after leaving Zynga, but did so in connection with his plans

26  to join Scopely.  Maietti is now employed by Scopely as a Vice President and

27  General Manager of Product Development, developing games that are intended to

28  compete directly with Zynga.

- 13 -

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

41.     The next day, on July 5, 2016, Maietti informed his supervisor, Pete Hawley ("Hawley"), that he intended to resign from Zynga to accept a position with Scopely.  Hawley responded by instructing Maietti not to take any documents or information from Zynga and not to target employees on his team for employment with Scopely.  That same day, Hawley informed Zynga's human resources department of Maietti's resignation, and stated that Maietti's resignation may need to be effective immediately.

42.     On July 7, 2016, the final day of his employment with Zynga, Maietti also accessed approximately 13,000 Project Mars files stored on a local drive between 4:36 p.m. and 4:59 p.m.  On information and belief, Maietti copied those files to a personal Box Sync folder on his desktop which uploaded the documents to his account on Box, a cloud-based storage and sharing application.  After copying the Project Mars files to his Box Sync folder, Maietti deleted the local folder from his laptop.  Similarly, on July 7, 2016, seven files once existed in a Dropbox folder on Maietti's laptop.  The folder and its contents were subsequently deleted that same day.  Again, Maietti had no legitimate business purpose for engaging in these actions.

43.     On July 7, 2016, over 20,000 files and folders were located within the Trash on Maietti's laptop, but were permanently removed by Maietti before his resignation from Zynga.

44.     On information and belief, Maietti commenced employment with Scopely on July 11, 2016, though he was paid by Zynga through July 21, 2016.

45.     On July 12, 2016, Maietti signed and delivered to Zynga a "Termination Certification," in which he certified that he did "not have in [his] possession, [nor had he] failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to Zynga, Inc."  Maietti further certified that,

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

1  consistent with his EIACA, for a period of twelve months following his resignation,
2  he would not "directly or indirectly, solicit, induce, recruit or encourage any of
3  [Zynga's] employees to leave their employment."

4      46.    The very next day, on July 13, 2016, Scopely's Chief People Officer,
5  Neal, emailed via LinkedIn and solicited a Zynga Lead Product Manager, Park,
6  with whom Maietti had worked closely on *FarmVille 2*.  Neal explained that she
7  had heard favorable feedback about Park from her "network", and she wanted to
8  speak with Park about potential employment opportunities at Scopely.  Prior to
9  receiving this message, Park had never communicated with Neal and did not know
10  her.

11      47.    On August 15, 2016, Park attended interviews at Scopely's
12  headquarters in Los Angeles, and his first interview was with Maietti.  During the
13  interview, Maietti attempted to convince Park to join Scopely, promising him more
14  responsibility at Scopely than Park enjoyed at Zynga.  On August 29, 2016, Park
15  received a job offer from Scopely, which he ultimately declined.

16      **E.    Defendant Barlach Was Contractually Obligated To Protect
17      Zynga's Confidential, Proprietary, And Trade Secret Information,
        And To Return That Information Upon The Termination Of His
18      Employment.**

19      48.    In November 2013, Zynga hired Barlach as Director of Operations,
20  Real Money Gaming.  Barlach worked as the General Manager of *Hit It Rich*! at the
21  time of his departure from Zynga.  In connection with his position at Zynga,
22  Barlach was provided with access to Zynga's confidential, proprietary, and trade
23  secret information related to Zynga's existing, and yet-to-be released games.  As a
24  condition of his employment, therefore, Barlach executed an EIACA, which
25  provides, in pertinent part, that:

26          a)  Barlach "understand[s] that [his] employment by the Company creates
27              a relationship of confidence and trust with respect to any information
28              of a confidential or secret nature that may be disclosed to [him] by the

- 15 -                  COMPLAINT FOR DAMAGES AND
                              INJUNCTIVE RELIEF

Company . . . and that the Company has taken reasonable measures under the circumstances to protect from unauthorized use or disclosure";

b) Barlach agreed that the information protected by the EIACA ("Proprietary Information") includes, among other things, "game information, [including] features, roadmaps, plans, specifications, mechanics, designs, costs and revenue," "techniques and methods for developing, coding, or improving online social games;" "measurement techniques, and specific functionality that increases monetization and both measures and increases retention metrics," "non-public financial information, which may include revenues, profits, margins, forecasts, budgets and other financial data," "marketing and advertising plans, strategies, tactics, budgets and studies; . . . business and operations strategies," "research and development plans," and "employment and personnel information";

c) Barlach agreed that he would "[a]t all times, both during [his] employment and after its termination, . . . keep and hold all such Proprietary Information in strict confidence and trust . . . [and not] . . . use, disclose, copy, reverse-engineer, distribute, gain unauthorized access or misappropriate any Proprietary Information without the prior written consent of the Company except as may be necessary to perform [his] duties as an employee of the Company for the benefit of the company";

d) Barlach agreed that he would, "[u]pon termination of [his] employment with the Company, . . . promptly deliver to the Company all documents and materials of any nature or form, in [his] possession, custody or control, pertaining to [his]work with the Company and, upon Company request, will execute a document confirming [his]

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

agreement to honor [his] responsibilities contained in this Agreement";

e) Barlach agreed that "in the event of a breach or threatened breach of this Agreement by [him] the Company may suffer irreparable harm and will therefore be entitled to injunctive relief to enforce this Agreement"; and

f) Barlach agreed that "for a period of one (1) year [after his employment ends, he] will not directly or indirectly solicit away employees or consultants of the Company for [his] own benefit or for the benefit of any other person or entity."

**F.   Shortly Before His Departure From Zynga, Barlach Accessed Zynga Game Files And Folders In A Dropbox Account And Attached A USB Drive To His Zynga-Issued Computer.**

49.   Zynga is informed and believes, and thereupon alleges, that by early July 2016, and likely earlier, Barlach was being recruited by and was considering employment with Scopely.

50.   On July 21, 2016, Christina Dunbar ("Dunbar"), Scopely's Talent Strategy Partner, sent an iMessage to Barlach, confirming his travel itinerary, presumably related to interviews in Los Angeles with Scopely.  Ten days later, on July 31, 2016, Barlach received another iMessage from Scopely, confirming that he had received Scopely's offer letter.

51.   On August 8, 2016, Barlach accessed numerous Dropbox files and folders with the title "HIR," which stands for Zynga's game, *Hit It Rich!*, including, but not limited to "SIR + HIR Export Strategy_July 2016.pdf," "HIR, SIR, TV Benchmark Report_July 2016.pdf," and "Zynga."

52.   On August 10, 2016, while still employed by Zynga, Barlach sent an iMessage to Dunbar, offering to consult with her regarding other Zynga employees that could be targeted for employment with Scopely.  Dunbar responded: "Thanks!!  I was saving that for your first day! LOL I would be happy to hear about

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  anyone you think I should be trying to speak with.  Obviously I know you have the

2  clause about not taking people so I am always careful ☺"

3      53.    On August 22, 2016, after accepting employment with Scopely,

4  Barlach connected an external USB to his Zynga-issued computer.  Zynga is

5  informed and believes, and thereupon alleges that Barlach copied and transferred a

6  folder titled "Hit It Rich!" onto this external USB drive.

7      54.    On August 24, 2016, Barlach sent an email to Zynga employees

8  announcing that he was resigning from Zynga and that his last day would be on

9  September 2, 2016.  Barlach withheld that he was going to a direct-competitor of

10  Zynga, and instead evasively stated that he was "offered a role which is great

11  opportunity."  Even when Barlach was directly asked by Zynga employees, he

12  refused to disclose that he was going to Scopely, stating "Not saying where I'm

13  going yet ☺."

14      55.    On September 1, 2016, Barlach signed and delivered to Zynga a

15  "Termination Certification," in which he certified that he did "not have in [his]

16  possession, [nor had he] failed to return, any devices, records, data, notes, reports,

17  proposals, lists, correspondence, specifications, drawings, blueprints, sketches,

18  materials, equipment, other documents or property, or reproductions of any

19  aforementioned items belonging to Zynga, Inc."  Barlach further certified that,

20  consistent with his EIACA, for a period of twelve months following his resignation,

21  he would not "directly or indirectly, solicit, induce, recruit or encourage any

22  [Zynga] employees to leave their employment."

23      56.    While Barlach's final day at Zynga was on September 1, 2016, he was

24  officially terminated from his position at Zynga on September 2, 2016.  Barlach

25  was paid by Zynga through September 2, 2016.

26      57.    Around the time of Barlach's resignation, and after Barlach had agreed

27  to consult with Scopely regarding the recruitment of other Zynga employees,

28  Scopely solicited two other key players in Zynga's Slots group, Hess, Chief

COMPLAINT FOR DAMAGES AND
                                                                    INJUNCTIVE RELIEF

Technology Officer, Slots, and Copeland, Divisional Executive Producer, Slots, and Scopely solicited and hired Heck and Hou from the Slots group.

### G.  Additional Zynga Employees Copy Zynga's Trade Secrets, Confidential, and Proprietary Information Prior To Resigning To Accept Positions With Scopely.

58.    On September 3, 2016, the day after Barlach resigned and six days before Heck himself resigned to accept a position with Scopely, Heck, like Barlach and Maietti, attached an external USB device to his Zynga-issued laptop computer. Heck went through extraordinary efforts to cover his tracks, which included clearing his internet history and deleting more than 24,000 files and folders in the last month of his employment with Zynga.  Forensic analysis of Heck's computer also revealed that Heck referenced articles on his Zynga computer entitled, "How to erase my hard drive and start over" and "How to Erase a Computer Hard Drive - How To Articles."  Heck had no legitimate business purpose for engaging in these actions.  On September 9, 2016, Heck resigned from his position at Zynga to work for Scopely.

59.    On October 9 and 10, 2016,  the two days before his last day at Zynga, Hou, like Maietti, Barlach, and Heck, connected an external USB device to his Zynga-issued computer.  On October 11, 2016, Hou resigned from his position with Zynga to work for Scopely.

60.    Zynga is informed and believes that Maietti, Barlach, Hou, and Heck currently work for Scopely in similar roles to their prior positions at Zynga.  The data taken from Zynga by Maietti, Barlach, Hou, and Heck could be used not only to improve Scopely's directly-competing socially interactive games, but also to undermine Zynga's release of Project Mars, and to improve Scopely's understanding of Zynga's game mechanics, monetization techniques, and business model.

61.    Zynga is informed and believes that Scopely has benefitted and will

continue to benefit from its continuing possession of and/or access to Zynga's confidential, proprietary, and trade secret information.

62.     Zynga is informed and believes, and thereupon alleges that, with respect to each and every allegation set forth in Paragraphs 1-61, inclusive, Defendants and each of them conspired and agreed to undertake the above-described acts in furtherance of their conspiracy, with knowledge of the nature and goals of the conspiracy and its unlawful purpose.

63.     If Defendants are not immediately restrained from accessing, disclosing, using, and/or destroying Zynga's stolen data, Zynga will continue to suffer irreparable and irreversible harm.

## FIRST CAUSE OF ACTION

### (Violation of the Defend Trade Secrets Act – Against Defendants Scopely and Maietti)

64.     Zynga incorporates by reference paragraphs 1 through 63 of this Complaint.

65.     Zynga enjoys an advantage over its existing and would-be competitors based, in part, on the trade secret information it has developed and implemented in its effort to become and remain a market leader in online games.  That trade secret information includes data related to its methodologies for creating, developing, and optimizing online social games, unreleased games, new game ideas, strategic roadmaps, monetization plans and efforts, statistical data gathering and metrics, confidential revenue data, negative knowledge based on trial and error, and sensitive personnel data.

66.     Zynga has made reasonable efforts under the circumstances to preserve the confidentiality of its trade secrets.  Among other things, Zynga requires its employees (specifically including but not limited to defendant Maietti) to enter into agreements that protect the confidentiality of its trade secrets and uses physical and technological security measures to prevent unauthorized acquisition of its trade

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

1   secrets.

2        67.    Zynga's confidential information derives independent economic value

3   from not being generally known to the public or to other persons who can obtain

4   economic value from its disclosure or use.  A competitor could use this information

5   to create games more efficiently and market games more effectively.  Accordingly,

6   the above-described information constitutes "trade secrets" within the meaning of

7   the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1839.

8        68.    Maietti was and remains under a duty both to keep Zynga's

9   confidential, proprietary or trade secret information secret, and not to copy, use, or

10  disclose such information other than for the benefit of Zynga and with Zynga's

11  authorization.  By taking this information from Zynga without its authorization,

12  Maietti knew or should have known that he acquired such information under

13  circumstances giving rise to a breach of a duty to maintain its secrecy and limit its

14  use.  Indeed, Maietti signed a certification at the time of his termination

15  acknowledging this duty and affirming that he had returned Zynga's trade secret

16  information, which again reminded Maietti of his obligations at the crucial time of

17  his separation from employment.

18       69.    Defendants misappropriated Zynga's trade secrets through the

19  unauthorized taking and retention of Zynga's trade secret information, including

20  through Maietti's actions in the final weeks of his employment, including

21  downloading, copying, and erasing digital files containing Zynga's confidential

22  information and, on information and belief, taking those files to Scopely.

23       70.    Defendants' actual and threatened misappropriation was and is being

24  carried out without the express or implied consent of Zynga.

25       71.    Zynga is informed and believes that Defendants obtained the trade

26  secret information described above directly or indirectly from Zynga and not from

27  generally available information or through their own independent research and

28  efforts.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

72.     Defendants' actions constitute willful misappropriation and/or threatened misappropriation of Zynga's trade secrets under the DTSA.  On information and belief, Maietti deliberately copied Zynga trade secrets in the days and weeks before he resigned for the specific purpose of taking them to Scopely. Those trade secrets related to projects on which he was currently working and others that he had worked on previously, and related to games that had been released and others that had not.  After Maietti gave notice of his resignation, Zynga reminded Maietti of his obligation not to misappropriate Zynga trade secrets and instructed him to return all documents containing trade secrets to Zynga. Significantly, Maietti confirmed in writing that he had returned all trade secrets to Zynga, but on information and belief Maietti's written confirmation was knowingly false.  Maietti's misappropriation of Zynga trade secrets was not accidental; it was willful.

73.     Defendants' actual and threatened misappropriation of Zynga's trade secrets, unless and until enjoined and restrained by order of this Court, is causing and will continue to cause great and irreparable harm to Zynga.  Zynga is threatened with losing its intellectual property as well as current and potential business.

74.     Zynga has no adequate remedy at law for the injuries currently being suffered, and the additional injuries that are threatened, because it would be impossible to quantify in dollars the losses described above when this matter is finally adjudicated.  Defendants will continue to engage in their wrongful conduct and Zynga will continue to suffer irreparable injury that cannot be adequately remedied at law unless Defendants are enjoined from engaging in any further such acts of misappropriation.

75.     In addition, as a direct and proximate cause of Defendants' misappropriation of Zynga trade secrets, Defendants have been unjustly enriched in an amount to be ascertained at trial, and Zynga has sustained, and will continue to

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

sustain, actual damages in an amount to be proven at trial.  Zynga also has suffered irreparable harm as a result of Defendants' actions.

76.     Each of the acts of misappropriation was done willfully and maliciously by Defendants with the deliberate intent to injure Zynga's business and improve their own business and for financial gain, thereby entitling Zynga to exemplary damages and/or attorneys' fees to be proved at trial.

## SECOND CAUSE OF ACTION

### (Breach of Contract – Against Defendant Maietti)

77.     Zynga incorporates by reference paragraphs 1 through 76 of this Complaint.

78.     As a condition of his employment with Zynga, Maietti executed Zynga's Employment Invention Assignment and Confidentiality Agreement ("EIACA"), a true and correct copy of which is attached hereto as Exhibit A. Maietti also executed a Termination Certification, a true and correct copy of which is attached hereto as Exhibit B.

79.     Maietti's EIACA and Termination Certification with Zynga constitute valid, binding and enforceable contracts that require Maietti to maintain the secrecy of Zynga's confidential, proprietary, and trade secret information, and to return all such information, documents, and property of Zynga upon termination of his employment with Zynga.

80.     The EIACA and Termination Certification that Maietti entered into with Zynga also required Maietti, for a period of one year after the end of his employment, to not directly or indirectly solicit, recruit, encourage or induce Zynga employees for his own benefit or for the benefit of any other person or entity.

81.     Zynga has performed (or was excused from performing) all of its obligations under the EIACA and Termination Certification.

82.     Maietti breached his contractual obligations to Zynga by (a) taking information belonging to Zynga without its knowledge or authorization, and for

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

reasons unrelated to the performance of his duties for Zynga; (b) failing to return Zynga's data upon leaving Zynga's employ; (c) on information and belief, disclosing Zynga's confidential, proprietary, and/or trade secret information to, and/or using such information on behalf of, his new employer Scopely and/or its agents; and (d) on information and belief, directly or indirectly soliciting, recruiting, encouraging, and/or inducing Zynga employees to resign from Zynga and join Scopely.

83.    As a proximate result of Maietti's breach of contract, Zynga has suffered, and will continue to suffer, general and special damages in an amount to be proven at trial.  Zynga seeks compensation for all damages and losses proximately caused by these breaches.

## THIRD CAUSE OF ACTION

### (Breach of Contract – Against Defendant Barlach)

84.    Zynga incorporates by reference paragraphs 1 through 83 of this Complaint.

85.    As a condition of his employment with Zynga, Barlach executed an EIACA, a true and correct copy of which is attached hereto as Exhibit C.  Barlach also executed a Termination Certification, a true and correct copy of which is attached hereto as Exhibit D.

86.    The EIACA and Termination Certification with Zynga constitute valid, binding and enforceable contracts that require Barlach to maintain the secrecy of Zynga's confidential, proprietary, and trade secret information, and to return all such information, documents, and property of Zynga upon termination of his employment with Zynga.

87.    The Barlach EIACA and Termination Certification that Barlach entered into with Zynga also required Barlach, for a period of one year after the end of his employment, to not directly or indirectly solicit, recruit, encourage or induce Zynga employees for his own benefit or for the benefit of any other person or

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

entity.

88.     Zynga has performed (or was excused from performing) all of its obligations under the EIACA and Termination Certification.

89.     Barlach breached his contractual obligations to Zynga by (a) on information and belief, taking information belonging to Zynga without its knowledge or authorization, and for reasons unrelated to the performance of his duties for Zynga; (b) on information and belief, failing to return Zynga's data upon leaving Zynga's employ; (c) on information and belief, disclosing Zynga's confidential, proprietary, and/or trade secret information to, and/or using such information on behalf of, his new employer Scopely and/or its agents; and (d) on information and belief, directly or indirectly soliciting, recruiting, encouraging, and/or inducing Zynga employees to resign from Zynga and join Scopely.

90.     As a proximate result of Barlach's breach of contract, Zynga has suffered, and will continue to suffer, general and special damages in an amount to be proven at trial.  Zynga seeks compensation for all damages and losses proximately caused by these breaches.

## FOURTH CAUSE OF ACTION

### (Tortious Interference with Contract – Against Defendant Scopely)

91.     Zynga incorporates by reference paragraphs 1 through 63, 78, 80, 81, 82(d), 83, 85, 87, 88, 89(d), and 90 of this Complaint.

92.     Maietti and Barlach were parties to binding contracts with Zynga, including their EIACAs and Termination Certifications.

93.     Zynga is informed and believes, and thereupon alleges, that at all relevant times Defendant Scopely knew that Maietti and Barlach were signatories to EIACAs and Termination Certifications with Zynga.  On information and belief, Scopely knew that the EIACAs and Termination Certifications required Maietti and Barlach, among other things, not to directly or indirectly solicit away employees or consultants of Zynga for benefit of any other person or entity.  Scopely's

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

1  knowledge of their non-solicitation obligations is illustrated by Dunbar's message

2  to Barlach stating:  "I would be happy to hear about anyone you think I should be

3  trying to speak with.  Obviously I know you have the clause about not taking

4  people so I am always careful ☺"  (Smiling symbol included in original.)

5       94.    Zynga is informed and believes, and thereupon alleges, that Scopely

6  intentionally interfered with the EIACAs and Termination Certifications by

7  requesting that Maietti and Barlach assist in the solicitation of Zynga employees for

8  Scopely's benefit.  Despite Scopely's knowledge of these obligations, Scopely

9  prioritized the targeting of Zynga employees, as illustrated by Dunbar's emphatic

10  message to Barlach stating:  "I was saving that for your first day!"  On information

11  and belief, this message was typical of Scopely's *modus operandi* to attempt to

12  induce each new hire from Zynga to identify other Zynga employees for solicitation

13  and to assist in the process of soliciting those employees.

14       95.    Scopely interfered with Maietti's and Barlach's EIACAs and

15  Termination Certifications knowingly and with the intent to have Maietti and

16  Barlach breach their agreements.  These acts by Scopely have caused and will

17  continue to cause Zynga to suffer economic damages proximately caused by the

18  intentional interference, including but not limited to the disruption of Scopely's

19  operations and unjust enrichment gained by Scopely.

20       96.    These acts by Scopely also have caused and, unless enjoined, will

21  continue to cause irreparable damage to Zynga, including but not limited to loss of

22  competitive advantage, for which Zynga has no adequate remedy at law.

23       97.    Each of the acts of interference was done willfully and maliciously by

24  Scopely, with the deliberate intent to injure Zynga's business and improve its own

25  business and for financial gain, thereby entitling Zynga to punitive damages and/or

26  attorneys' fees to be proven at trial.  Scopely's willfulness is illustrated by Dunbar's

27  written expressions of laughter at Zynga's contractual rights in her message to

28  Barlach stating not only that she wanted to hear about Zynga employees whom

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

Scopely could solicit but also that she was laughing out loud—"LOL"—about Barlach's willingness to comply, despite his non-solicitation agreement.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Zynga prays for judgment and relief as follows:

1.      Temporary, preliminary and permanent injunctive relief enjoining Scopely and Maietti from using or disclosing Zynga's confidential information or trade secrets, including but not limited to any information taken by any former Zynga employees.

2.      Preliminary and permanent injunctive relief enjoining Maietti and Barlach from, directly or indirectly, soliciting, recruiting, encouraging or inducing any Zynga employee to terminate his or her employment with Zynga in violation of their EIACAs and/or Termination Certificates.

3.      Preliminary and permanent injunctive relief enjoining Scopely from encouraging, causing or permitting Maietti, Barlach or any other former Zynga employee who is employed by Scopely from violating any contractual obligation such person owes to Zynga not to, directly or indirectly, solicit, recruit, encourage or induce any Zynga employee to terminate his or her employment with Zynga.

4.      Temporary, preliminary, and permanent injunctive relief requiring the immediate return of Zynga's stolen data, in forensically sound fashion, preserving all metadata of Zynga's stolen data, and prohibiting the altering, destroying, or disposing of any materials related to this action, including any confidential information Defendants obtained from Zynga;

5.      Compensatory damages, past and future, in an amount to compensate Zynga;

6.      General damages;

7.      An accounting to establish, and an order requiring restitution and/or disgorgement of, the sums by which Defendants have been unjustly enriched;

8.      Exemplary and punitive damages for Defendants' willful and

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

malicious actions;

9.    Pre-judgment and post-judgment interest at the maximum rate allowed by law;

10.   Attorneys' fees and costs incurred by virtue of this action; and

11.   For such other and further relief as the Court may deem proper.


Dated:  November 29, 2016

DARIN SNYDER
ERIC AMDURSKY
O'MELVENY & MYERS LLP


By:    /s/ Eric Amdursky
Eric Amdursky
Attorneys for Plaintiff
Zynga, Inc.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF