DARIN SNYDER (S.B. #136003)
dsnyder@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, California 94111-3823
Telephone:  (415) 984-8700
Facsimile:   (415) 984-8701

ERIC AMDURSKY (S.B. #180288)
eamdursky@omm.com
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, California  94025-7019
Telephone:  (650) 473-2600
Facsimile:   (650) 473-2601

Attorneys for Plaintiff
Zynga Inc.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO

| | |
|---|---|
| ZYNGA INC.,<br><br>                    Plaintiff,<br><br>          v.<br><br>SCOPELY, INC., a Delaware Corporation, MASSIMO MAIETTI, an individual, and EHUD BARLACH, an individual,<br><br>                    Defendants. | Case No.<br><br>**NOTICE OF MOTION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION;  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |

# NOTICE OF MOTION

TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on _____, 2016, at _____ a.m./pm. or as soon as the matter may be heard, in Courtroom ___of the Honorable _____ at the United States District Court for the Northern District of California, _____th Floor, 450 Golden Gate Avenue, San Francisco, CA  94102, Plaintiff Zynga Inc. ("Zynga") hereby applies to this Court *ex parte* for a Temporary Restraining Order enjoining defendants Scopely, Inc. ("Scopely") and Massimo Maietti ("Maietti") from any further use or disclosure of Zynga's confidential information or trade secrets, including but not limited to any information taken by former Zynga employees, and specifically including but not limited to any information contained in the nine zip file archives that Maietti copied onto any external USB device prior to his departure from Zynga.  Zynga seeks a corresponding order to show cause why Scopely and Maietti should not be similarly restrained in a preliminary injunction pending trial, and further seeks an order to show cause regarding a preliminary injunction enjoining:  (1) Maietti and defendant Ehud Barlach ("Barlach") from, directly or indirectly, soliciting, recruiting, encouraging or inducing any Zynga employee to terminate his or her employment with Zynga; and (2) Scopely from encouraging, causing or permitting Maietti, Barlach, or any other current or former Zynga employee from violating any contractual obligation such person owes to Zynga not to, directly or indirectly, solicit, recruit, encourage or induce any Zynga employee to terminate his or her employment with Zynga.

Zynga makes this Application on the grounds that Scopely's and Maietti's misappropriation of trade secrets threatens Zynga with great and irreparable harm. Immediately before resigning his employment with Zynga and joining Scopely, Maietti secretly copied a wealth of valuable, confidential Zynga information— despite the fact that he certified in writing at the time of his termination that he had

returned all such information.  Money damages will be inadequate to remedy the harm caused to Zynga if Scopely—a competitor of Zynga—is able to use that information for its own benefit.  Zynga further makes this Application on the grounds that Maeitti's and Barlach's violations of their Employment Invention Assignment and Confidentiality Agreements and Termination Certifications, and Scopely's inducements of such violations, would also cause Zynga irreparable harm.  Zynga seeks an order to show cause why such violations should not be enjoined in light of Scopely's written communication to Barlach regarding the identification of Zynga employees to solicit, in which Scopely stated:  "LOL I would be happy to hear about anyone you think I should be trying to speak with. Obviously I know you have the clause about not taking people so I am always careful ☺"

This Application is based on this Notice, the accompanying Memorandum of Points and Authorities, the Application for Temporary Restraining Order and Order to Show Cause re: Preliminary Injunction and supporting Memorandum of Points and Authorities, the accompanying Declarations of Tracy Esposito, Pete Hawley, Scott Koenigsberg, Melanie Maugeri, and Josh Park, the records on file with this Court, and such other and further showing as may be made before the Court.

Dated:  November 29, 2016   O'MELVENY & MYERS LLP

By: _/s/ Eric Amdursky_
   Eric Amdursky
Attorneys for Plaintiff Zynga, Inc.

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ............................................................................. 1

II. STATEMENT OF FACTS ................................................................ 2

    A.   Background Regarding The Parties' Social Gaming Businesses ......... 2

    B.   Maietti's Taking Of Zynga Trade Secrets To Scopely .................... 3

    C.   Barlach's Offer To Help Scopely Solicit Zynga Employees............... 7

III. ARGUMENT .................................................................................. 9

    A.   Defendants Should Be Restrained Under The DTSA From Using Or Disclosing Zynga's Trade Secrets........................................ 9

        1.   The DTSA Creates Subject Matter Jurisdiction. ..................... 10

        2.   Overview Of Claims Under The DTSA. ................................. 10

        3.   Zynga Is Sufficiently Likely To Prevail On Its Trade Secret Claim To Support An Injunction Against Misappropriation........................................................ 11

            a.   Zynga Is Entitled To Trade Secret Protection............... 11

            b.   Zynga Acts Reasonably To Protect Its Trade Secrets.................................................................... 13

            c.   Defendants Should Be Enjoined From Misappropriating Zynga's Trade Secrets. ................... 15

        4.   Zynga Faces Irreparable Harm Absent An Injunction. ........... 17

        5.   The Balance Of The Hardships Heavily Favors Zynga. ......... 18

        6.   The Public Interest Favors Injunctive Relief........................ 19

        7.   No Injunction Bond Should Be Required............................. 19

    B.   Defendants Should Be Restrained Under Their Agreements From Using Or Disclosing Zynga's Information............................... 20

    C.   Defendants Should Be Ordered To Show Cause Why They Should Not Be Restrained From Violating Their Agreements Not To Solicit Zynga Employees........................................... 21

        1.   Enough Evidence Exists Of Defendants' Violations Of Their Non-Solicitation Agreements To Warrant Further Inquiry.................................................................... 21

        2.   Zynga Faces Irreparable Harm. ........................................ 23

        3.   The Balance Of The Hardships Favors Relief........................ 25

        4.   The Public Interest Favors Relief. ..................................... 25

IV. CONCLUSION ............................................................................. 25

       APPLICATION FOR TRO AND P.I.

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**CASES**

4

5

*Adams Arms, LLC v. Unified Weapon Sys., Inc.*,
  2016 U.S. Dist. LEXIS 132201 (M.D. Fla. Sept. 27, 2016) ...............11

6

7

*Ajaxo Inc. v. E\*Trade Grp, Inc.*,
  135 Cal. App. 4th 21 (2006) ................................................................20

8

9

*Am. Impex Corp. v. Int'l Ace Tex, Inc.*,
  2009 U.S. Dist. LEXIS 113103 (C.D. Cal. 2009) ...............................24

10

11

*Angelotti Chiropractic, Inc. v. Baker*,
  791 F.3d 1075 (9th Cir. 2015) ...............................................................9

12

13

*Arthur J. Gallagher & Co. v. Lang*,
  C 14-0909 CW, 2014 U.S. Dist. LEXIS 71286 (N.D. Cal. May 23,
  2014) .....................................................................................................22

14

15

*Bank of Am., N.A. v. Lee*,
  2008 U.S. Dist. LEXIS 110410 (C.D. Cal. Sept. 22, 2008) ..........19, 25

16

17

*Boardman v. Pac. Seafood Grp.*,
  822 F.3d 1101 (9th Cir. 2016) ...............................................................9

18

19

*Brown Bag Software v. Symantec Corp.*,
  960 F.2d 1465 (9th Cir. 1992) .............................................................12

20

21

*Cirrus Holding Co. v. Cirrus Indus., Inc.*,
  794 A.2d 1191 (Del. Ch. 2001) ...........................................................24

22

*Courtesy Tem. Serv., Inc. v. Camacho*,
  222 Cal. App. 3d 1278 (1990) .............................................................12

23

24

*Dish Network L.L.C. v. Ramirez*,
  2016 U.S. Dist. LEXIS 72317 (N.D. Cal. June 2, 2016) .....................18

25

26

*EF Johnson Co. v. Uniden Corp. of Am.*,
  623 F. Supp. 1485 (D. Minn. 1985) .....................................................19

27

28

*Fitspot Ventures, LLC v. Bier*,
  2015 U.S. Dist. LEXIS 116579 (C.D. Cal. Sept. 1, 2015) ............15, 16

APPLICATION FOR TRO AND P.I.

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Henry Schein, Inc. v. Cook,*
   2016 U.S. Dist. LEXIS 76038 (N.D. Cal. June 6, 2016) ................. 10, 18, 19, 25

*Henry Schein, Inc. v. Cook,*
   2016 U.S. Dist. LEXIS 81369 (N.D. Cal. June 22, 2016) ................................. 10

*JustMed, Inc. v. Byce,*
   600 F.3d 1118 (9th Cir. 2010) ......................................................................... 15

*K-2 Ski Co. v. Head Ski Co., Inc.,*
   506 F.2d 471 (9th Cir. 1974) ........................................................................... 14

*Loral Corp. v. Moyes,*
   174 Cal. App. 3d 268 (1985) ....................................................................... 22, 25

*MAI Sys. Corp. v. Peak Comput., Inc.,*
   991 F.2d 511 (9th Cir. 1993) ........................................................................... 13

*Marco & Co., LLC v. Deaconess/Billings Clinic Health Sys.,*
   954 P.2d 1116 (Mont. 1998) ............................................................................ 25

*Morlife, Inc. v. Perry,*
   56 Cal. App. 4th 1514 (1997) .......................................................................... 14

*MSC Software Corp. v. Altair Engineering, Inc.,*
   No. 2:07-cv-12807, 2014 U.S. Dist. LEXIS 134165 (E.D. Mich.
   Sept. 23, 2014) ................................................................................................ 22

*Nike, Inc. v. McCarthy,*
   379 F.3d 576 (9th Cir. 2004) ........................................................................... 17

*North Atl. Instruments, Inc. v. Haber,*
   188 F.3d 38 (2d Cir. 1999) .............................................................................. 17

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck
   Consumer Pharms. Co.,*
   290 F.3d 578 (3d Cir. 2002) ............................................................................ 19

*Oasis West Realty, LLC v. Goldman,*
   51 Cal. 4th 811 (2011) ..................................................................................... 21

APPLICATION FOR TRO AND P.I.

1

2

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

3

4

*PHP Healthcare Corp. v. EMSA Ltd. P'ship,*
    14 F.3d 941 (4th Cir. 1993) ............................................................................. 17

5

6

*ReadyLink Healthcare v. Cotton,*
    126 Cal. App. 4th 1006 (2005) ........................................................................ 13

7

8

*Reeves v. Hanlon,*
    33 Cal. 4th 1140 (2004) ................................................................................... 21

9

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.,*
    944 F.2d 597 (9th Cir. 1991) ........................................................................... 24

10

11

*Whyte v. Schlage Lock Co.,*
    101 Cal. App. 4th 1443 (2002) ........................................................................ 14

12

13

*Winter v. Nat. Res. Def. Council, Inc.,*
    55 U.S. 7 (2008) ................................................................................................. 9

14

**STATUTES**

15

16

18 U.S.C. § 1833 ..................................................................................................... 10

17

18 U.S.C. § 1836 ..................................................................................................... 10

18

18 U.S.C. § 1836(3) ................................................................................................. 15

19

18 U.S.C. § 1838 ..................................................................................................... 20

20

18 U.S.C. § 1839(3) .......................................................................................... 11, 12

21

18 U.S.C. § 1839(5)(A) ........................................................................................... 11

22

23

18 U.S.C. § 1839(5)(B) ........................................................................................... 11

24

18 U.S.C. § 1839(6) ................................................................................................. 11

25

130 Stat. 381 P.L. 114-153, § 2(d) ......................................................................... 10

26

27

28

APPLICATION FOR TRO AND P.I.

## I.      INTRODUCTION

Plaintiff Zynga Inc. ("Zynga") seeks an immediate temporary restraining order to prevent defendant Scopely, Inc. ("Scopely") from misusing critical trade secrets stolen from Zynga by one and likely more former Zynga employees now working for Scopely.

Zynga makes ubiquitous social games like smartphone favorite *Words with Friends* and Facebook staple *Farmville*.  Zynga's social games are serious business, having generated *billions of dollars* in revenues over the last decade.  Defendant Massimo Maietti ("Maietti") was employed by Zynga as its Creative Director.  Maietti was responsible for the overarching design of Zynga games, including a high-stakes, soon-to-be-released game.

When Maietti resigned to go to work for Scopely, his boss reminded him of his contractual obligation not to take any files with him.  Maietti assured Zynga he would not take anything.  But Zynga recently learned that Maietti left with nine "zip" files containing digital libraries of highly-confidential and highly-valuable design and marketing information regarding Zynga's games—everything that a game designer like Maietti would need to design imitation games for Scopely.

Maietti's theft came to light after four key Zynga employees joined Scopely in four months—one of whom deleted more than 24,000 files from his computer after conducting Internet searches on how to erase a hard drive.  Significantly, after each resignation, Scopely made targeted solicitations of employees in closely-related positions, which suggested potential violations of the employees' non-solicitation agreements.  Forensic examination confirmed that suspicion.  While still an employee of Zynga and almost two weeks before giving notice of his departure, Defendant Ehud Barlach ("Barlach") offered to provide consultation to Scopely in its efforts to solicit other Zynga employees.  In a response that revealed Scopely's *modus operandi* when onboarding a Zynga employee, the Scopely recruiter stated:  "Thanks!!  I was saving that for your first day! LOL I would be

happy to hear about anyone you think I should be trying to speak with.  Obviously I know you have the clause about not taking people so I am always careful ☺"  Careful to avoid getting get caught, but not to act lawfully.

Zynga seeks an immediate temporary restraining order preventing Defendants from using the Zynga trade secrets that at least one (and likely more) former employee wrongfully took with them to Scopely.  This is modest relief sought to prevent irreparable harm from the use or disclosure of Zynga's trade secrets.

Although Zynga does not seek to enforce its non-solicitation provisions on an *ex parte* basis, Zynga does request expedited discovery and an order to show cause why Defendants should not be restrained from violating those provisions pending trial.  Scopely's approval of Barlach's offer to assist in the targeting of Zynga employees notwithstanding its knowledge of his contrary obligations is highly troubling.  But to avoid any potential delay in obtaining a TRO to protect its trade secrets, Zynga is willing to defer a ruling on the breaches of the non-solicitation agreements until after Defendants have had an opportunity to respond.

## II.    STATEMENT OF FACTS

### A.    Background Regarding The Parties' Social Gaming Businesses

Since 2007, Zynga rapidly became one of the world's leading social gaming companies and a top developer of game applications for mobile devices and social networking sites.  (Koenigsberg Decl. ¶ 3.)  It is publicly traded on the Nasdaq stock exchange and has a market capitalization of approximately $2.5 billion.  (*Id.*)  Sixty million people in the world play Zynga's games each month.  (*Id.*)

Some of Zynga's most popular games include its *with Friends* series, including its 2009 smash hit *Words with Friends,* as well as *Chess with Friends*, *Gems with Friends, Hanging with Friends,* and *Matching with Friends.* (*Id.* ¶ 4.)  Zynga is also known for its *Ville* series, including *FarmVille* (also launched in 2009) and its wildly popular sequels including *FarmVille 2* (launched in 2012) and

APPLICATION FOR TRO AND P.I.

*FarmVille 2: Country Escape!* (2014), as well as *CastleVille, CityVille, FrontierVille,* and *PetVille*. (*Id.* ¶ 5.) Zynga has also invested heavily in its successful casino-themed social games, including *Hit It Rich! Slots* (2013), *Wizard of Oz Slots* (2014), and *Willy Wonka Slots* (2016). Similarly, Zynga's crime-themed games include *Mafia Wars* (launched in 2009), and *Mafia Wars 2* (2011). (*Id.* ¶ 6.)

Success breeds copycats. Scopely was founded in 2011, at a time when Zynga's nine-figure revenues had already made clear how big the social and mobile gaming industry would be. (*Id.* ¶ 8.) Scopely sought to emulate Zynga's success by copying its business as closely as possible. In answer to Zynga's *with Friends* series, Scopely created a *with Buddies* series, including *Dice with Buddies*, *Jewels with Buddies,* and *Yahtzee with Buddies*. (*Id.*)

It has been apparent for years that Scopely's business has been built on copying Zynga's. But Zynga has just learned that Scopely's copying may not be limited to Zynga's concepts, but extends to unlawful copying of Zynga's trade secret information. Accordingly, Zynga brings this application for a TRO.

### B.   Maietti's Taking Of Zynga Trade Secrets To Scopely

Maietti worked for Zynga between January 2011 and July 2016, when he resigned to go to Scopely—taking with him copies of nine "zip" file archives containing over 14,000 digital documents full of Zynga trade secret design and marketing information. (Esposito Decl. ¶¶ 6, 14; Maugeri Decl. ¶¶ 11-16.)

Between 2012 and 2015, Maietti was the Lead Designer and Director of Design on *Farmville 2*. (Koenigsberg Decl. ¶ 10.) Maietti was responsible for designing new features and content, including tuning the feature economy and system for optimization, to be released in the game. (*Id.*) Zynga's *Farmville* franchise has been highly successful, generating over a billion dollars in revenues. (*Id.* ¶ 5.) Maietti made significant contributions to that success by leading the release of quarterly upgrades and new features that attracted and retained

APPLICATION FOR TRO AND P.I.

1  customers.  (*Id*. ¶ 10.)

2      From the Spring of 2015 to his departure, Maietti was the Creative Director

3  for an unreleased game, still in development at Zynga, code-named "Project Mars."

4  (Hawley Decl. ¶ 5.)  On Project Mars, Maietti was primarily responsible for the

5  creative direction of the game, as well as supervising and managing the entire

6  design team.  (*Id*.)  Zynga has put substantial resources into the development of

7  Project Mars, which is an ambitious project with complex gameplay interactions

8  and systems built upon revolutionary technology developed over the past 18

9  months by a team of engineers, artists, and product managers.  (*Id*. ¶ 3.)  Zynga

10  believes it will bring social gaming to another level.  (*Id*.)

11      Having occupied top-level, strategic positions overseeing game design on

12  two of Zynga's most important franchises, Maietti was necessarily privy to some of

13  Zynga's most valuable trade secrets regarding its game design and marketing.  (*Id*.

14  ¶ 5.)  And Zynga acted accordingly.  In addition to significant physical and

15  technological security measures designed to protect that information from outsiders,

16  Zynga entered into agreements with its employees—including Maietti—to protect

17  the information from misuse or disclosure by insiders.  (Esposito Decl. ¶¶ 4, 7,

18  20(a-h).)

19      In his Employment Invention Assignment and Confidentiality Agreement

20  ("EIACA"), Maietti acknowledged that he occupied a position of "confidence and

21  trust with respect to any information of a confidential or secret nature," and he

22  agreed that he would not improperly "use, disclose, copy, reverse-engineer,

23  distribute, gain unauthorized access or misappropriate" any of Zynga's trade secrets

24  at any time, either during his employment or after its termination.  (*Id*. ¶ 8, Exh. B

25  at § 7.)  Maietti expressly agreed that upon the termination of his employment, he

26  would "promptly deliver to the Company all documents and materials of any nature

27  or form, in [his] possession, custody or control, pertaining to [his] work with the

28  Company and, upon Company request, will execute a document confirming [his]

APPLICATION FOR TRO AND P.I.

agreement to honor [his] responsibilities contained in this Agreement." (*Id.* ¶ 9, Exh. B at § 9.)

When Maietti gave notice of his resignation to Pete Hawley, his supervisor, Hawley's first thought was the protection of Zynga's trade secrets.  Hawley verbally reminded Maietti not to take any information or documents with him. (Hawley Decl. ¶ 7.)  Hawley also accelerated Maietti's last day of employment to cut off his continued access to trade secrets.  (*Id.* ¶ 8.)  And, consistent with Maietti's promise in the EIACA, Zynga requested that Maietti confirm in writing that he had returned all of Zynga's trade secrets.  (Esposito Decl. ¶ 15.)  Maietti signed a Termination Certification in which he confirmed he had done so.  (*Id.*, Exh. C.)  But Zynga has just learned that Maietti's certification was a lie.

In fact, just one day before he gave notice of his resignation, Maietti connected an external USB device to his Zynga laptop and copied nine "zip" files containing archives of Zynga's trade secrets, as follows:

- "Project_Mars-2016-07-04.zip" is an archive of approximately 12,200 files relating to Zynga's unreleased game code-named, "Project Mars."  These files include user concepts, theme testing, art exploration, core design, feedback surveys, financial projections, "go-to-market" plans, engineering information, and word and language choices for the game.  The files include (a) "MW Greenlight," a confidential 68-page presentation used to obtain multi-million dollar funding and approval for the game, which represents the culmination of two months of work; (b) a Remote Longitudinal November 2015 Final Report" representing surveys of gamers; and (c) "Issues to discuss with Jon Levin," a specific list of questions for the Dean of the Stanford Graduate School of Business whom Zynga hired to assess economically-complex aspects of the game and strategies for monetization. (Hawley Decl. ¶¶ 10-13; Maugeri Decl. ¶ 13(a).)

- "FV2-2016-07-04.zip" is an archive of approximately 480 files relating to *FarmVille 2*, including detailed design specifications used by the design,

APPLICATION FOR TRO AND P.I.

engineering, art, and products teams to create new, revenue generating features for the game.  (Koenigsberg Decl. ¶ 17; Maugeri Decl. ¶ 13(b).)  Notably, the files include "Full Spec - My Farm Co-Op," which is a complete specification in the form of a 172-slide PowerPoint presentation for one of the most successful features in *FarmVille 2*.  (Koenigsberg Decl. ¶ 17.)

- "Farm_2_-_LE_and_Feature_Content-2016-07-04.zip" is an archive of approximately 800 additional files relating to *FarmVille 2*, including "cadence" content, or features that Zynga released in prior games.  (Koenigsberg Decl. ¶ 18; Maugeri Decl. ¶ 13(c).)  Having this information compiled in one location would save a company significant time and money if it were to create a farm simulation game.  (Koenigsberg Decl. ¶ 18.)

- "FtV2-2016-07-04.zip" is an archive of approximately 55 files relating to *FrontierVille 2*, an unreleased game, including production specifications and documents related to creative direction, narrative, and game fiction.  (Koenigsberg Decl. ¶ 19; Maugeri Decl. ¶ 13(d).)  Included among other files is the spreadsheet "FTV2 UI-UX Best Practices" that analyzes industry practices for user interfaces for similar games compared to Zynga's best practices.  (Koenigsberg Decl. ¶ 19.)

- "CastleVille_Documentation-2016-07-04.zip" is an archive of approximately 750 files relating to *CastleVille*, including sales targets and revenue goals, feature ideas, and design resources.  (Koenigsberg Decl. ¶ 20; Maugeri Decl. ¶ 13(e).)  Among other things, the files include a spreadsheet titled, "What Monetizes Well - Recipes - Ingredients - Buildable Parts - 2013 01 18," which provides data and analysis regarding the relative success of different features to generate revenue.  (Koenigsberg Decl. ¶ 20.)

- "CastleVille-2016-07-04.zip" is an archive of approximately four additional files relating to *CastleVille*, including files relating to feature concepts to increase user engagement and growth.  (Koenigsberg Decl. ¶ 21; Maugeri Decl. ¶ 13(f).)

- "ArcadeVille-2016-07-04.zip" contains one file relating to *ArcadeVille*,

APPLICATION FOR TRO AND P.I.

which summarizes the essential elements of an unreleased game concept, including social features, game world, avatar system, metrics, monetization, and animated photos of the game.  (Koenigsberg Decl. ¶ 22; Maugeri Decl. ¶ 13(g).)

• "Z-Platform-2016-07-04.zip" is an archive of approximately seven files relating to an unreleased concept for Zynga.com, which includes statistical data related to games used to organize and classify player behavior and activity. (Koenigsberg Decl. ¶ 23; Maugeri Decl. ¶ 13(h).)  Among other things, the files include "Token Economy Model," which uses data collection to maximize revenue generation.  (Koenigsberg Decl. ¶ 23.)

• "SDP's-2016-07-04.zip" is an archive of approximately 100 files relating to employee mentoring, skill development, and career development.  (Koenigsberg Decl. ¶ 24; Maugeri Decl. ¶ 13(i).)  Among other things, the files include "Feature Development Timeline," a 37-page PowerPoint presentation for improving the quality of features, reducing late stage changes in features, and providing more accurate cost assessments.  (Koenigsberg Decl. ¶ 24.)

In his EIACA, Maietti also agreed not to directly or indirectly solicit Zynga employees for a year following his termination.  In his Termination Certification signed July 12, 2016, Maietti further agreed that for one year, he would "not directly or indirectly, solicit, induce, recruit or encourage any of the Company's employees to leave their employment."  (Esposito Decl. ¶ 23; Exh. C.)  Maietti remained on Zynga's payroll through July 21, 2016.  Yet the very next day after Maietti signed his Termination Certification, while Zynga was still paying him, Scopely solicited Zynga's Lead Product Manager, Joshua Park, who worked closely with Maietti, telling Park that Scopely had heard favorable feedback about him. (Park Decl. ¶ 6.)  When Park attended his interviews with Scopely, his first interview was with Maietti, who encouraged Park to leave Zynga.  (*Id.* ¶ 9.)

**C.     Barlach's Offer To Help Scopely Solicit Zynga Employees.**

Barlach was hired by Zynga in 2013 and served as General Manager of *Hit It*

APPLICATION FOR TRO AND P.I.

1    *Rich! Slots ("Hit it Rich!")*.  (Koenigsberg Decl. ¶ 13.)  Like Maietti, Barlach

2    occupied top-level positions for the games on which he worked.  (*Id*.)  And like

3    Maietti, Barlach signed an EIACA and Termination Certification in which he

4    agreed not to misuse or disclose Zynga's trade secrets and in which he agreed not to

5    directly or indirectly solicit Zynga's employees.  (Esposito Decl. ¶ 17, Exhs. D, E.)

6        Like Maietti, Barlach appears to have accessed Zynga trade secrets in

7    anticipation of his resignation.  On August 8, 2016, after Scopely offered him

8    employment, Barlach accessed files and folders stored on Dropbox named "SIR +

9    HIR Export Strategy_July 2016.pdf," "HIR, SIR, TV Benchmark Report_July

10   2016.pdf," and "Zynga".  (Maugeri Decl. ¶ 24.)  As late as August 22, 2016,

11   Barlach attached an external USB device to his Zynga-issued computer.  (*Id*. ¶ 23.)

12   Forensic analysis suggests that Barlach may have copied a folder titled "Hit It

13   Rich!" to that drive, though details are limited at this time.  (*Id*.)

14       Forensic analysis is even stronger that Barlach improperly solicited Zynga

15   employees.  On August 10, 2016, while still employed by Zynga, Barlach sent an

16   iMessage to Christina Dunbar ("Dunbar"), Scopely's Talent Strategy Partner,

17   offering to consult with her regarding other Zynga employees that Scopely was

18   considering to target for employment at Scopely.  (*Id*. ¶ 26.)  Dunbar responded:

19   "Thanks!!  I was saving that for your first day! LOL I would be happy to hear about

20   anyone you think I should be trying to speak with.  Obviously I know you have the

21   clause about not taking people so I am always careful ☺"  (*Id*.)

22       Shortly thereafter, Scopely solicited four other key players in Zynga's Slots

23   group:  Chuck Hess, Chief Technology Officer, Slots; Matthew Copeland,

24   Divisional Executive Producer, Slots; Derek Heck ("Heck"), Product Manager on

25   *Wizard of Oz Slots* and *Willy Wonka Slots*; and Evan Hou ("Hou"), a Manager, Data

26   Analytics who was embedded with the *Hit it Rich!* group.  (Koenigsberg Decl.

27   ¶¶ 14-15, 26.)  Indeed, Hou was solicited by Scopely no later than September 6,

28   2016, just four days after Barlach's last day.  (Maugeri Decl. ¶ 40.)  Both Heck and

Hou attached external USB devices to their Zynga-issued laptops less than a week before resigning.  (*Id.* ¶¶ 30, 37.)

Significantly, Heck deleted more than 24,000 files and folders from his Zynga-issued computer before he resigned from Zynga.  (*Id.* ¶ 31.)  Heck visited websites titled "How to erase to my hard drive and start over" and "How to Erase a Computer Hard Drive – How To Articles," before deleting 24,000 files, his Internet browser history, Internet download folder, and Trash.  (*Id.* ¶¶ 31, 32.)

Thus, there are at least four former Zynga employees now working for Scopely who may have taken Zynga trade secrets.  And that is just what Zynga knows now, before conducting discovery.

## III.   ARGUMENT

"To obtain a preliminary injunction, a plaintiff must demonstrate that: (1) it 'is likely to succeed on the merits'; (2) it 'is likely to suffer irreparable harm in the absence of preliminary relief'; (3) 'the balance of equities tips in [its] favor'; and (4) 'an injunction is in the public interest.'"  *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1101, 1120 (9th Cir. 2016) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 55 U.S. 7, 20 (2008)).  "'Serious questions going to the merits and hardship balance that tips sharply towards [plaintiffs] can [also] support issuance of a[] [preliminary] injunction, so long as there is a likelihood of irreparable injury and the injunction is in the public interest.'"  *Angelotti Chiropractic, Inc. v. Baker*, 791 F.3d 1075, 1081 (9th Cir. 2015) (citation and internal quotation marks omitted).

### A.   Defendants Should Be Restrained Under The DTSA From Using Or Disclosing Zynga's Trade Secrets.

It is well-settled that employees cannot copy their employers' trade secrets and take them to new employers.  Yet that is precisely what Maietti did: immediately before resigning, Maietti copied electronic libraries of data files about Zynga's games to a portable drive that he could take with him when he went to work for Scopely.  To prevent Defendants from reaping the benefits of

APPLICATION FOR TRO AND P.I.

1    misappropriating Zynga's trade secrets, Zynga seeks an immediate but *limited* TRO

2    restraining Defendants from using or disclosing its trade secrets.

3    **1.    The DTSA Creates Subject Matter Jurisdiction.**

4    The DTSA was passed with overwhelming bipartisan support (410 to 2 in the

5    House of Representatives and 87 to 0 in the Senate) and was signed into law by

6    President Obama on May 11, 2016.  Its provisions apply to any conduct occurring

7    after that date, including the conduct at issue in this action.  18 U.S.C. § 1833, Act

8    May 11, 2016, P.L. 114-153, § 2(d), 130 Stat. 381.

9    The DTSA creates a new federal civil remedy for misappropriation of trade

10   secrets and confers federal subject matter jurisdiction over such claims.  18 U.S.C.

11   § 1836 ("An owner of a trade secret that is misappropriated may bring a civil action

12   under this subsection if the trade secret is related to a product or service used in, or

13   intended for use in, interstate or foreign commerce.").  Zynga's trade secrets satisfy

14   that standard.  Its games are sold throughout the United States and the world.

15   (Koenigsberg Decl. ¶ 7.)  The design and marketing information that Maietti took

16   relates to social games that are sold in interstate and foreign commerce.  (*Id.* ¶ 25.)

17   The first case seeking interim injunctive relief under the DTSA in this

18   District was filed within a month of the DTSA's passage.  *See Henry Schein, Inc. v.*

19   *Cook*, 2016 U.S. Dist. LEXIS 76038, at *15 (N.D. Cal. June 6, 2016) (granting

20   application for TRO under the DTSA and ordering that "Defendant, and all those

21   acting in concert or participation with her, are hereby enjoined from directly or

22   indirectly accessing, using, disclosing, or making available to any person or other

23   entity other than Plaintiff, any of HIS's confidential, proprietary, or trade secret

24   documents, data or information."); 2016 U.S. Dist. LEXIS 81369, at *32 (N.D. Cal.

25   June 22, 2016) (granting preliminary injunction including same prohibition).

26   **2.    Overview Of Claims Under The DTSA.**

27   The DTSA prohibits "misappropriation" of a trade secret.  Misappropriation

28   includes "acquisition of a trade secret of another by a person who knows or has

- 10 -                    APPLICATION FOR TRO AND P.I.

reason to know that the trade secret was acquired by improper means."  18 U.S.C.

§ 1839(5)(A).  Misappropriation also includes:

> disclosure or use of a trade secret of another without express or
> implied consent by a person who—(i) used improper means to acquire
> knowledge of the trade secret; [or] (ii) at the time of disclosure or use,
> knew or had reason to know that the knowledge of the trade secret
> was . . . (II) acquired under circumstances giving rise to a duty to
> maintain the secrecy of the trade secret or limit the use of the trade
> secret; or (III) derived from or through a person who owed a duty to
> the person seeking relief to maintain the secrecy of the trade secret or
> limit the use of the trade secret.

18 U.S.C. § 1839(5)(B).  "Improper means" includes "theft, bribery,

misrepresentation, breach or inducement of a breach of a duty to maintain secrecy,

or espionage through electronic or other means."  18 U.S.C. § 1839(6).

18 U.S.C. § 1839(3) defines the term "trade secret" to mean:

> all forms and types of financial, business, scientific, technical,
> economic, or engineering information . . . if—(A) the owner thereof
> has taken reasonable measures to keep such information secret; and
> (B) the information derives independent economic value, actual or
> potential, from not being generally known to, and not being readily
> ascertainable through proper means by, another person who can obtain
> economic value from the disclosure or use of the information

The DTSA's definitions mirror those contained in the Uniform Trade Secrets

Act ("UTSA"), versions of which exist in the majority of states, including

California.  Accordingly, while the DTSA is an entirely new federal statute, the

Court can borrow from decisions interpreting the UTSA, at least to the extent that

the statutes are not in conflict.  *See Adams Arms, LLC v. Unified Weapon Sys., Inc.*,

2016 U.S. Dist. LEXIS 132201, at *14 (M.D. Fla. Sept. 27, 2016) ("The DTSA

includes definitions, remedies, and a statute of limitations substantially similar to

provisions in the Uniform Trade Secrets Act.").

### 3.   Zynga Is Sufficiently Likely To Prevail On Its Trade Secret Claim To Support An Injunction Against Misappropriation.

#### a.   Zynga Is Entitled To Trade Secret Protection.

Zynga's design and marketing information regarding its games easily

satisfies the requirement of deriving "independent economic value, actual or

APPLICATION FOR TRO AND P.I.

1   potential, from not being generally known." 18 U.S.C. § 1839(3).

2       In *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465 (9th Cir. 1992),

3   the Ninth Circuit held that analogous software development and testing information

4   was entitled to strong trade secret protection.  In that case, Symantec produced such

5   information pursuant to a protective order that prevented disclosure to Brown Bag's

6   in-house counsel.  Brown Bag argued its in-house counsel needed access to the

7   information to participate in the litigation in a meaningful way.  The Ninth Circuit

8   disagreed and upheld the protective order.  As relevant here, even though it sought

9   access to the information, even Brown Bag admitted that the information

10  constituted a trade secret:  "The parties agree that source codes, development plans,

11  and beta tester information . . . constitute protectable trade secrets."  *Id.* at 1470.

12      The result must be the same here.  On July 4, 2016, just one day before he

13  gave notice of his resignation from Zynga, Maietti connected an external USB

14  device to his Zynga laptop and copied nine "zip" files containing  repositories of

15  Zynga files relating to many of its most important games—including an upcoming,

16  unreleased game code-named "Project Mars," which Maietti was working on at the

17  time of his resignation, and also including substantial information regarding other

18  Zynga games including *FarmVille, FarmVille 2, and CastleVille.*  (Maugeri Decl.

19  ¶¶ 11-16; Koenigsberg Decl. ¶¶ 16-24.)  This information is not accessible to the

20  public and is not generally known.  (Koenigsberg Decl. ¶¶ 16-24; Hawley Decl.

21  ¶ 14.)  It is, however, incredibly valuable to Zynga, and it would have significant

22  value to any competitor of Zynga (like Scopely) that wanted to create and market

23  competing games without doing all of the necessary work to do so on its own.

24  (Koenigsberg Decl. ¶¶ 16-24; Hawley Decl. ¶ 14.)

25      While the type of information that can qualify for trade secret protection is

26  broad, courts have held that a hallmark of trade secret information is the cost of

27  creating it.  *See, e.g., Courtesy Tem. Serv., Inc. v. Camacho*, 222 Cal. App. 3d 1278,

28  1288 (1990) ("Here, the evidence established that Courtesy's customer list and

1  related information was the product of a substantial amount of time, expense and

2  effort on the part of Courtesy."); *ReadyLink Healthcare v. Cotton*, 126 Cal. App.

3  4th 1006, 1020 (2005) ("there is substantial evidence establishing that ReadyLink's

4  lists of hospitals and nurses, as well as other proprietary and confidential

5  information listed in the preliminary injunction, were procured by substantial time,

6  effort, and expense.").  That is the case here.

7          "Project Mars" has been under development at Zynga for approximately a

8  year and a half.  (Hawley Decl. ¶ 3.)  The team working on it includes

9  approximately fifty employees.  (*Id*.)  In addition to significant labor costs, Zynga

10  has incurred other substantial expenses related to the game's development,

11  including retaining a Professor of Economics from Stanford University to assist

12  with the development of the in-game economy and spending approximately

13  $68,000 to hire an outside consultant to conduct a survey of potential customers to

14  determine what features to include.  (*Id*. ¶¶ 12, 13.)  The information taken by

15  Maietti contains detailed information regarding the design and marketing of

16  Zynga's games, including the culmination of the work of the entire team working

17  on the game, which was created at significant expense.  (*Id*. ¶ 3.)  This information

18  would have significant value to a competitor interested in creating competing

19  games without having to do all the necessary work on its own.  (*Id*. ¶ 14.)  It easily

20  qualifies as "valuable" information that is protectable as a trade secret.

21          **b.     Zynga Acts Reasonably To Protect Its Trade Secrets.**

22          Zynga takes reasonable steps to ensure the secrecy of its trade secret

23  information by restricting access to its premises, limiting access to information

24  within the company, password protecting information on its computers, providing

25  training on confidentiality obligations, and requiring employees to sign

26  confidentiality agreements.  (Esposito Decl. ¶¶ 20(a-h).)  Such steps entitle Zynga's

27  confidential information to be afforded trade secret protection.  *See MAI Sys. Corp.*

28  *v. Peak Comput., Inc.*, 991 F.2d 511, 521 (9th Cir. 1993) ("MAI took reasonable

1    steps to insure the secrecy to this information as required by the UTSA.  MAI

2    required its employees to sign confidentiality agreements respecting its trade

3    secrets, including the Customer Database.  Thus, under the UTSA, the MAI

4    Customer Database constitutes a trade secret.”); *K-2 Ski Co. v. Head Ski Co., Inc.*,

5    506 F.2d 471, 474 (9th Cir. 1974); *see also Whyte v. Schlage Lock Co.*, 101 Cal.

6    App. 4th 1443, 1454 (2002) (“Requiring employees to sign confidentiality

7    agreements is a reasonable step to ensure secrecy.”); *Morlife, Inc. v. Perry*, 56 Cal.

8    App. 4th 1514, 1523 (1997) (storing trade secrets “on computer with restricted

9    access” and using a “confidentiality provision” were “reasonable steps . . . to

10   protect the information from disclosures.”).

11        Zynga’s entry into agreements to protect its trade secrets is not only a

12   generally applicable practice, but was uniformly followed with the individuals at

13   issue here.  In his EIACA, Maietti agreed:  “At all times, both during my

14   employment and after its termination, I will keep and hold all such Proprietary

15   Information in strict confidence and trust.  I will not use, disclose, copy, reverse-

16   engineer, distribute, gain unauthorized access or misappropriate any Proprietary

17   Information . . . .”  (Esposito Decl. ¶ 8, Exh. B at § 9.)  Barlach, Heck, and Hou

18   made the same promises in their EIACAs.  (*Id.* ¶¶ 17-19, Exhs. D, F, and H.)

19        When Maietti resigned, his supervisor immediately took additional steps to

20   protect Zynga’s trade secrets.  Hawley verbally reminded Maietti not to take any

21   Zynga files or documents with him to Scopely.  (Hawley Decl. ¶ 7.)  To cut off

22   Maietti’s continued access to Zynga’s trade secrets, Hawley also requested that

23   Zynga’s human resources make Maietti’s resignation effective immediately, even

24   though Maietti had given a standard two-weeks’ notice.  (*Id.* ¶ 8.)

25        In accordance with Maietti’s earlier agreement in his EIACA, Zynga also

26   requested Maietti to sign a Termination Certification, which Maietti did on July 12,

27   2016.  In his Termination Certification, Maietti again agreed “that, in compliance

28   with the [EIACA], I will preserve as confidential all trade secrets, confidential

knowledge, data or other proprietary information . . ." (Esposito Decl. ¶ 15, Exh. C.)  Barlach, Heck, and Hou also signed an EIACA and Termination Certification containing identical promises.  (*Id.* ¶¶ 17-19, Exhs. D-I.)

Because Zynga engages in reasonable efforts to maintain the confidentiality of its trade secrets, Zynga is entitled to protection under the DTSA.

**c.     Defendants Should Be Enjoined From Misappropriating Zynga's Trade Secrets.**

Under the DTSA, the Court may grant an injunction "to prevent any actual or threatened misappropriation" of trade secrets.  18 U.S.C. § 1836(3); *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1131 (9th Cir. 2010) (holding in a case where the defendant possessed but did not use the plaintiff's computer files, "the district court may issue an injunction against [the defendant's] threatened use or disclosure").  Zynga concurrently seeks expedited discovery to confirm whether Defendants have actually used its trade secrets—something that is inherently difficult for a plaintiff to prove before discovery takes place.  At a minimum, however, there is sufficient evidence of Defendants' misconduct to justify injunctive relief:  Maietti's actions in copying Zynga's trade secrets in violation of his EIACA to a portable storage device immediately before his resignation, his false certification that he had returned Zynga's trade secrets when in fact he did not, and his secretly taking those trade secrets when he started employment with Scopely.

In *Fitspot Ventures, LLC v. Bier*, 2015 U.S. Dist. LEXIS 116579 (C.D. Cal. Sept. 1, 2015), the court issued a TRO to prevent use or disclosure of trade secrets in similar circumstances.  In that case, the plaintiff-company requested the return of its files from the defendant-former employee.  The defendant in that case kept a copy of those files.  The court granted a TRO:  "Plaintiff has provided evidence that Defendant has acted outside the scope of the Confidentiality agreement by . . . maintaining a hard drive with information that was suppose [sic] to be turned over to Plaintiff."  *Id.* at *9.  "Furthermore, Plaintiff alleges that Defendant is now

- 15 -

working for another tech company, Honk.com, that may benefit." *Id.* "Therefore, the Court finds that Plaintiff will likely succeed in establishing that its customer information and source code qualify as trade secrets and that Defendant's conduct amounts to 'actual or threatened' misappropriation." *Id.* at *8-10.

Similarly here, there is substantial evidence that Maietti acted in violation of his repeated agreements to return Zynga's trade secrets to it at the conclusion of his employment.  In his EIACA, Maietti agreed:  "Upon termination of my employment with the Company, I will promptly deliver to the Company all documents and materials of any nature or form, in my possession, custody or control, pertaining to my work with the Company and, upon Company request, will execute a document confirming my agreement to honor my responsibilities contained in this Agreement.  I will not take with me or retain any documents or materials or copies thereof containing any Proprietary Information." (Esposito Decl. ¶ 9, Exh. B at § 9.)  In fact, Zynga did request that Maietti provide the written confirmation described in his EIACA, which Maietti signed on July 12, 2016.  Maietti's Termination Certification states:  "This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to Zynga." (Esposito Decl. ¶ 15, Exh. C.)

Despite Maietti's assurances that he had returned all of Zynga's trade secrets, a forensic examination of Maietti's computer usage discloses that, the day before resigning, Maietti copied nine "zip" files—each containing large numbers of digital files including design and marketing information relating to several Zynga games—to an external storage device.  (Maugeri Decl. ¶¶ 11-16; Koenigsberg ¶¶ 16-24.)  Maietti knew at that time that he would be going to work for a competitor of Zynga—defendant Scopely—where that information would be a valuable resource. (Hawley Decl. ¶ 14.)  Did Maietti actually use that information on behalf of

APPLICATION FOR TRO AND P.I.

Scopely?  Discovery will tell.  But as the Court found in *Fitspot Ventures*, an injunction against such use should issue when an employee copies his employer's electronic information, refuses to return it to the employer, and instead takes it to a competitor who could exploit it.

### 4.    Zynga Faces Irreparable Harm Absent An Injunction.

The courts have routinely recognized that a competitor's misuse of a company's trade secrets constitutes irreparable harm.  *See, e.g., Nike, Inc. v. McCarthy*, 379 F.3d 576, 587 (9th Cir. 2004) ("Nike has shown potential harm from unfair competition due to McCarthy's knowledge of confidential information peculiar to Nike's products"); *PHP Healthcare Corp. v. EMSA Ltd. P'ship*, 14 F.3d 941, 945-46 (4th Cir. 1993) (noting that irreparable harm is "presumed where trade secrets or customer lists are used or existing customers solicited."); *North Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) ("loss of trade secrets cannot be measured in money damages because [a] trade secret once lost is, of course, lost forever.") (citations and internal quotation marks omitted).  Misuse of Zynga's trade secrets would cause irreparable harm.

First, if Defendants incorporate Zynga's trade secrets into a Scopely game, it will be difficult to precisely calculate monetary damages.  Zynga makes small sales to millions of customers.  (Koenigsberg Decl. ¶ 27.)  Zynga will unfairly lose customers if Scopely releases imitation games that are built on Zynga designs.  (*Id.* ¶ 28.)  But given the number of customers at issue, it would be a Herculean task to obtain testimony regarding whether they would have continued playing Zynga's games absent Scopely's unfair competition.  Meanwhile, Scopely will be unjustly enriched by using Zynga's trade secrets, and its profits from unjust enrichment may also be difficult to reduce to a monetary award.  (*Id.* ¶ 27.)  Absent timely injunctive relief, Zynga faces a substantial risk of being unable to secure a full remedy for Defendants' misconduct.  (*Id.* ¶¶ 27, 28.)

Second, even if the Court later enjoins Defendants from continuing their

APPLICATION FOR TRO AND P.I.

1  unlawful conduct, there is no effective remedy it can order to compel Zynga's

2  customers to return to Zynga.  If customers stop or reduce their playing Zynga's

3  games to play a Scopely game, a substantial number of those customers will not

4  return even if the Court later shuts Scopely's game down.  (*Id*. ¶ 28.)  The Court

5  cannot compel those customers to resume patronizing Zynga, even if it can enjoin

6  Defendants' unlawful conduct.  The damage will be irreparable.

7  **5.    The Balance Of The Hardships Heavily Favors Zynga.**

8       In weighing the balance of the hardships, it is important to keep in mind the

9  limited and modest nature of the relief that Zynga seeks:  a TRO restraining

10  Defendants from using Zynga's trade secrets.  Zynga does not seek an injunction

11  that prevents Maietti from working for Scopely.  Zynga does not seek an injunction

12  that prevents Scopely from releasing any product it developed on its own.  All

13  Zynga seeks is an injunction restraining Defendants from using the confidential

14  information that former Zynga employees copied in anticipation of joining Scopely.

15  On that limited issue, the balance of the hardships tips sharply in Zynga's favor.

16       In what appears to be the only decision in this District to have decided an

17  application for a TRO under the DTSA, the Court held in similar circumstances that

18  the balance of the hardships favors interim relief.  *See Henry Schein, Inc.*, 2016

19  U.S. Dist. LEXIS 76038.  On the one hand, the trade secret plaintiff will "suffer

20  irreparable harm if [defendant] is allowed to continue to try to divert its customers

21  using [plaintiff's] own confidential, proprietary, and trade secret documents and

22  information." *Id.* at *9.  "By contrast, [defendant] will suffer no undue hardship

23  because she would not be prohibited from engaging in activity that is proper." *Id.*

24  (quotation marks omitted).  "Accordingly, the Court concludes the balance of

25  equities tips in favor of granting the TRO." *Id.* at *10 (citing *Dish Network L.L.C.*

26  *v. Ramirez*, 2016 U.S. Dist. LEXIS 72317, at *7 (N.D. Cal. June 2, 2016) ("balance

27  of hardships tips in favor of plaintiff seeking injunction when it would 'do no more

28  than require Defendant to comply with federal and state . . . laws'")); *see also*

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) ("[T]he injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself.").

This Court should reach the same conclusion here.  Defendants cannot suffer any legitimate hardship by being restrained from misappropriating Zynga's trade secrets.  Having improperly acquired and retained Zynga's trade secrets, Defendants cannot plausibly complain of being restrained from using them.

### 6.  The Public Interest Favors Injunctive Relief.

The public interest similarly favors injunctive relief.  As the District Court explained in *Henry Schein, Inc.*, the "[p]ublic interest is also served by enabling the protection of trade secrets."  2016 U.S. Dist. LEXIS 76038, at *10 (citing *Bank of Am., N.A. v. Lee*, 2008 U.S. Dist. LEXIS 110410, at *7 (C.D. Cal. Sept. 22, 2008)).  There is no public interest in permitting one company to use another company's trade secrets.  *See EF Johnson Co. v. Uniden Corp. of Am.*, 623 F. Supp. 1485, 1504 (D. Minn. 1985) ("The defendant argues that the public has an interest in competition.  The public's interest, however, is in *fair* competition, and not the unlawful and unfair competition engaged in by the defendant.") (emphasis in original).  Thus, the public interest weighs in favor of injunctive relief here.

### 7.  No Injunction Bond Should Be Required.

Because of the limited nature of the relief sought in this TRO, the Court should enjoin Defendants from misappropriating Zynga's trade secrets without the need for any injunction bond.  In *Henry Schein, Inc.*, the Court granted a TRO under the DTSA and stated:  "Plaintiff argues that no bond should be required because the TRO will not cause any damage to [defendant's] legitimate business . . . .  The Court agrees, and concludes no bond is required."  2016 U.S. Dist. LEXIS 76038, at *10.  This Court should reach the same conclusion here.  Because of the modest relief sought in this TRO, no bond should be required.

APPLICATION FOR TRO AND P.I.

1

2

**B.     Defendants Should Be Restrained Under Their Agreements From Using Or Disclosing Zynga's Information.**

3

4

5

6

7

In addition to the DTSA's prohibitions on misappropriation of trade secrets, Zynga's EIACAs and Termination Certifications with its former employees, including Maietti and Barlach, provide an independent basis for a TRO.  The DTSA does not preempt that remedy.  *See* 18 U.S.C. § 1838 ("this chapter shall not be construed to preempt or displace any other remedies").

8

9

10

11

12

13

14

15

16

17

18

19

For the reasons described above, Zynga is also likely to prevail on its claim for breach of contract based on the taking of Zynga's confidential information, Zynga faces irreparable harm, and the balance of the hardships and public interest all favor issuance of a TRO.  In their EIACAs, Maietti and Barlach agreed that they would not use or disclose Zynga's confidential information, and that they would return all such materials upon the termination of their employment relationship. (Esposito Decl. ¶¶ 9, 17, Exhs. B at § 9, D at § 9 .)  They reaffirmed these promises at the time of their resignations in their Termination Certification.  (*Id.* ¶¶ 15, 17, Exhs. C, E.)  Yet Maietti violated his promise and gave false assurances to Zynga, and left his employment with a USB drive full of Zynga's confidential documents. (Maugeri Decl. ¶¶ 11-16.)  Defendants should be enjoined from further breaches of their agreements not to use or disclose Zynga's confidential information.

20

21

22

23

24

25

26

27

Significantly, Zynga can establish it is likely to prevail on its contract claims whether or not Defendants' conduct also constitutes misappropriation of trade secrets.  *See e.g., Ajaxo Inc. v. E*Trade Grp, Inc.*, 135 Cal. App. 4th 21, 62 n.38 (2006) ("In some cases, a breach of contract cause of action may be available where disclosed information does not qualify as a 'trade secret' . . . if the information is protected under a confidentiality or nondisclosure agreement.").  Thus, even if the Court finds some defect in of Zynga's DTSA claim, the Court should nevertheless issue a TRO to enforce the contracts protecting Zynga's information.

28

APPLICATION FOR TRO AND P.I.

**C.    Defendants Should Be Ordered To Show Cause Why They Should Not Be Restrained From Violating Their Agreements Not To Solicit Zynga Employees.**

To minimize the relief sought on an *ex parte* basis, and to allow time for Zynga to seek expedited discovery regarding the issue, Zynga does not ask that the Court issue an *ex parte* TRO enforcing Maietti's and Barlach's agreements not to solicit Zynga employees—but Zynga does ask that the Court issue an order to show cause why a preliminary injunction ordering such relief should not be granted.  A preliminary injunction that merely restrains Defendants from misappropriating Zynga's trade secrets, though important, will not fully prevent the injuries that Defendants are causing.  Defendants' targeted solicitations of employees who could exploit the information they have taken must also be stopped.

**1.    Enough Evidence Exists Of Defendants' Violations Of Their Non-Solicitation Agreements To Warrant Further Inquiry.**

Zynga is likely to prevail on its action for breach of Maietti's and Barlach's non-solicitation agreements and Scopely's inducement of that breach—or, at a minimum there is sufficient circumstantial evidence of such violations to merit immediate discovery and an order to show cause.

"[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for performance, (3) defendant's breach, and (4) the resulting damages to the plaintiff."  *Oasis West Realty, LLC v. Goldman*, 51 Cal. 4th 811, 820-21 (2011).  The elements of a cause of action for tortious interference with a contract are (1) an enforceable contract between plaintiff and a third-party; (2) defendant's knowledge of the existence of that contract; (3) defendant's intentional acts or conduct, designed to induce a breach or interruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.  *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148 (2004).  Those elements are satisfied here.

First, Zynga entered into EIACAs and Termination Certifications with

APPLICATION FOR TRO AND P.I.

Maietti and Barlach in which they agreed that, for a period of one year after their employment ended, they would not directly or indirectly solicit, induce, recruit or encourage Zynga employees to resign.  (Esposito Decl. ¶ 23, Exhs. B-E.)  Such agreements are enforceable under California law.  *See Loral Corp. v. Moyes*, 174 Cal. App. 3d 268, 279 (1985) (holding that a one-year restriction on interfering with or raiding employees is enforceable); *Arthur J. Gallagher & Co. v. Lang*, C 14-0909 CW, 2014 U.S. Dist. LEXIS 71286 (N.D. Cal. May 23, 2014) (enforcing an agreement not to "'solicit, induce or recruit any employee of [Gallagher] or its affiliates to leave the employ of [Gallagher] or its affiliates'"); *MSC Software Corp. v. Altair Engineering, Inc.*, No. 2:07-cv-12807, 2014 U.S. Dist. LEXIS 134165 (E.D. Mich. Sept. 23, 2014) (enforcing an agreement governed by California law not to "solicit, attempt to hire as an employee or consultant or otherwise attempt to persuade any other employee" to leave the employer).

Second, Zynga has performed all of its obligations under each of these agreements.  (Esposito Decl. ¶ 24.)  In fact, Maietti and Barlach are no longer employed by Zynga.  (*Id*.)  Zynga's obligations have been fully performed, whereas Maietti and Barlach owe continuing obligations to Zynga under their contracts.

Third, Scopely was aware of Maietti's and Barlach's obligations not to interfere with Zynga's employment relationships, yet actively induced the breach of those obligations.  When Barlach accepted Scopely's job offer, he offered to help Scopely in its solicitations of Zynga's workforce.  Scopely responded:  *"Thanks!!  I was saving that for your first day! LOL I would be happy to hear about anyone you think I should be trying to speak with.  Obviously I know you have the clause about not taking people so I am always careful ☺"* (Maugeri Decl. ¶ 26, emphasis added.)  In those few short words, Scopely admitted that it was aware of Barlach's obligations, was planning to ask Barlach to violate them, and expressly approved of Barlach doing so.  Scopely knowingly induced Barlach's breach.

Fourth, there is circumstantial evidence of actual breach—at least enough for

APPLICATION FOR TRO AND P.I.

expedited discovery and an order to show cause why Defendants should not be preliminarily enjoined.  Because Scopely is "careful" to violate the agreements only in secret, and because Zynga has not yet conducted any discovery, Zynga cannot definitively prove that Scopely and Barlach followed through on their agreement to have Barlach assist in interfering with Zynga's employment relationships.  For the same reason, Zynga cannot yet prove that Scopely made the same request of other former Zynga employees, including Maietti, on their first day (as it planned to do with Barlach).  However, the timing of Scopely's solicitations suggest that is precisely what happened.  The day after Maietti signed a Termination Certification in which he agreed not to directly or indirectly solicit Zynga employees, Scopely solicited Zynga's Lead Product Manager, Josh Park, with whom Maietti worked closely.  (Park Decl. ¶¶ 3, 6.)  After Barlach agreed to assist Scopely target Zynga employees, Scopely solicited two other key players in Zynga's Slots group, Chuck Hess, Chief Technology Officer, Slots, and Matthew Copeland, Divisional Executive Producer, Slots, and hired Heck and Hou from the Slots group.  (Koenigsberg Decl. ¶ 26; Esposito Decl. ¶¶ 18, 19; Maugeri Decl. ¶ 26.)  Notably, Scopely solicited Hou within four days of Barlach's resignation.  (Maugeri Decl. ¶ 40.)  Between the fact that Defendants discussed violating the non-solicitation agreements and the fact that solicitations actually occurred shortly thereafter, there is enough evidence to merit discovery and an order to show cause.

Fifth, Zynga has been damaged by Defendants' interference with its employment relationships, and it could suffer even greater losses if Defendants are not enjoined, as discussed immediately below.

### 2.    Zynga Faces Irreparable Harm.

The disruption of Zynga's employment relationships constitutes irreparable harm.  Once an employee resigns, the Court cannot compel that employee to rejoin Zynga.  And, in any event, the damage is done—at the time employees leave, their absence causes an immediate disruption in Zynga's operations.

APPLICATION FOR TRO AND P.I.

The Ninth Circuit has "recognized that intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm." *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("we have also recognized that intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm."). That is the case here. Four Zynga employees have resigned to join Scopely since July 2016. (Koenigsberg Decl. ¶ 26.) These employees occupied key positions, and their abrupt departures have caused disruptions in Zynga's operations. (*Id.*) One of the departed employees, Heck, deleted more than 24,000 digital files and folders in the last month of his employment, after referencing articles entitled, "How to erase my hard drive and start over" and "How to Erase a Computer Hard Drive - How To Articles." (Maugeri Decl. ¶¶ 31-32.)

Defendants' raiding of Zynga's workforce has already caused significant disruptions, and further raiding will compound those problems by removing key employees from important Zynga games. (Koenigsberg Decl. ¶ 26.) Accordingly, Zynga brings this application to prevent irreparable harm.

Maietti and Barlach expressly agreed in Section 16 of their EIACAs that "in the event of a breach or threatened breach of this Agreement by me the Company may suffer irreparable harm and will therefore be entitled to injunctive relief to enforce this Agreement. (Esposito Decl. ¶¶ 10, 17, Exhs. B at § 16, D at § 16.) Courts repeatedly have held that a stipulation to irreparable harm by the party to be enjoined is sufficient to satisfy irreparable harm. *See, e.g., Am. Impex Corp. v. Int'l Ace Tex, Inc.*, 2009 U.S. Dist. LEXIS 113103, *7-8 (C.D. Cal. 2009) ("Plaintiff has also demonstrated a likelihood of irreparable harm, since the parties expressly acknowledged in the Settlement Agreement that any breach would cause immediate and irreparable injury."), *Cirrus Holding Co. v. Cirrus Indus., Inc.*, 794 A.2d 1191, 1209 (Del. Ch. 2001) ("This Court has repeatedly held that contractual stipulations as to irreparable harm alone suffice to establish that element for the purpose of

APPLICATION FOR TRO AND P.I.

1  issuing preliminary injunctive relief."); *Marco & Co., LLC v. Deaconess/Billings*
2  *Clinic Health Sys.*, 954 P.2d 1116, 1118-19 (Mont. 1998) (same).

3          **3.      The Balance Of The Hardships Favors Relief.**

4          Zynga only has one workforce, and Defendants' targeted raiding of that
5  workforce causes significant damage.  By contrast, Scopely has the whole world's
6  labor force from which to draw in growing its own business.  The disruption to
7  Zynga's business thus outweighs any impact of an injunction on Defendants.

8          In similar circumstances, the court in *Loral Corp.* held that an employee-
9  raiding covenant should be enforced:  "The restriction presumably was sought by
10 plaintiffs in order to maintain a stable work force and enable the employer to
11 remain in business.  This restriction has the apparent impact of limiting
12 [defendant's] business practices in a small way in order to promote [plaintiff's]
13 business." 174 Cal. App. 3d at 280.  The result should be the same here.

14         **4.      The Public Interest Favors Relief.**

15         "[T]he public interest is served when defendant is asked to do no more than
16 abide by trade laws and the obligations of contractual agreements signed with her
17 employer."  *Henry Schein, Inc.*, 2016 U.S. Dist. LEXIS 76038, at *10 (citing *Bank*
18 *of Am., N.A. v. Lee*, 2008 U.S. Dist. LEXIS 110410, at *7 (C.D. Cal. Sept. 22,
19 2008)).  Maietti and Barlach expressly agreed that their promises could be enforced
20 by way of injunction.  (Esposito Decl. ¶¶ 10, 17, Exhs. B at § 16, D at § 16.)  The
21 public interest favors holding them to their word.

22 **IV.    CONCLUSION**

23         Zynga requests that Defendants be immediately restrained from using or
24 disclosing Zynga's trade secrets, including all of the digital files taken by former
25 Zynga employees now working at Scopely.  Zynga further requests that Defendants
26 be ordered to show cause why such a preliminary injunction should not issue
27 pending trial, and that they additionally be ordered to show cause why they should
28 not be preliminarily enjoined from violating their non-solicitation agreements.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Dated:  November 29, 2016          O'MELVENY & MYERS LLP

By:    */s/ Eric Amdursky*
                    Eric Amdursky
Attorneys for Plaintiff Zynga Inc.

APPLICATION FOR TRO AND P.I.