ROBERT S. SHWARTS (STATE BAR NO. 196803)
rshwarts@orrick.com
MICHAEL D. WEIL (STATE BAR NO. 209056)
mweil@orrick.com
CATHERINE Y. LUI (STATE BAR NO. 239648)
clui@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, California  94105-2669
Telephone: 415-773-5700
Fax 415-773-5759

Attorneys for Defendants Scopely, Inc., Massimo Maietti,
and Ehud Barlach.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZYNGA, INC.,<br><br>              Plaintiff,<br><br>        v.<br><br>SCOPELY, INC., a Delaware Corporation,<br>MASSIMO MAIETTI, an individual, and<br>EHUD BARLACH, an individual,<br><br>              Defendants. | Case No. 16-cv-06855-VC<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Date:<br>Time:<br>Courtroom:  4, 17th Floor<br>Judge:        Hon. Vince Chhabria |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................ 1

II.   STATEMENT OF FACTS ......................................................................................... 3

      A.    Scopely Is An Innovative Company Revolutionizing The Gaming Industry ......... 3

      B.    Scopely Undertakes Significant Efforts To Respect Other Companies'
            Confidential Information........................................................................................ 4

      C.    Scopely Undertook Comprehensive Precautions To Ensure No Zynga
            Confidential Information Would Be Disclosed To Or Used At Scopely
            When Hiring Former Zynga Employees ................................................................ 5

      D.    Scopely Has Collected, Preserved, And Quarantined Potentially Relevant
            Devices And Accounts ......................................................................................... 7

      E.    Zynga Has Not Presented Any Evidence That Scopely Misappropriated
            Zynga's Information............................................................................................... 7

      F.    Scopely Has Not Used Zynga's Confidential Information ..................................... 8

            1.    Massimo Maietti ........................................................................................ 8

            2.    Ehud Barlach............................................................................................. 9

            3.    Derek Heck and Evan Hou....................................................................... 10

      G.    Maietti And Barlach Have Not Solicited Any Current Zynga Employees ........... 11

III.  THE COURT SHOULD NOT ENTER A TEMPORARY RESTRAINING
      ORDER AGAINST SCOPELY OR MAIETTI. ......................................................... 12

      A.    Zynga Cannot Establish the Need for A TRO Against Scopely .......................... 12

            1.    Zynga has not demonstrated a likelihood of success on the merits of
                  its misappropriation claim against Scopely............................................... 13

                  a.    Zynga Submits No Evidence that Scopely Misappropriated
                        or Even Received Zynga's Confidential Trade Secret
                        Information....................................................................................... 13

                  b.    Zynga Has Failed to Demonstrate Protectable Trade Secrets. ...... 15

            2.    Zynga has not demonstrated that it is likely to suffer irreparable
                  harm in the absence of an injunction against Scopely. ............................ 16

                  a.    There is no risk that Scopely Will Use Zynga's Trade Secret
                        Information Because Scopely Does Not Have Such
                        Information....................................................................................... 16

                  b.    Zynga's Delay Negates It's Claim of Irreparable Harm. .............. 16

            3.    Zynga has not demonstrated that the equities tip in favor of an
                  injunction. ................................................................................................ 17

**TABLE OF CONTENTS**
(continued)

Page

    4.    Zynga has not demonstrated that an injunction is in the public interest. .................................................................................. 18

  B.  The Court Should Not Enter a TRO Against Massimo Maietti ......................... 19

IV.  THE COURT SHOULD DENY ZYNGA'S REQUEST FOR AN ORDER TO SHOW CAUSE AND PRELIMINARY INJUNCTION. ................................................. 20

  A.  The Court Should Not Enter An Order To Show Cause or Preliminary Injunction Based On Zynga's Misappropriation Claims. .................................... 20

  B.  The Court Should Not Enter An Order Based On Zynga's Breach of Contract Claims and Tortious Interference Claims. ............................................... 21

    1.    Zynga Cannot Show That It Is Likely To Succeed on it Claims For Breach Of Contract Or Tortious Interference. ........................................ 21

        a.    Zynga Cannot Show That It Is Likely to Succeed on it Claim For Breach of the "Termination Certificates." ................... 22

        b.    Zynga Cannot Show That It Is Likely to Succeed On Its claims for Breach of the EIACA. .................................................... 24

        c.    Zynga's Proposed Order Violates California Law and Defendants' Agreements. ................................................................ 26

    2.    Zynga has not demonstrated irreparable harm .......................................... 27

    3.    The Balance of Hardships Weighs Against An Injunction. ...................... 29

    4.    An Injunction will not be in the public interest. ....................................... 29

V.  CONCLUSION ............................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aetna Bldg. Maintenance Co. v. West,*
39 Cal. 2d 198 (1952) ....................................................................................23

*Agency Solutions.com, LLC v. TriZetto Group, Inc.,*
819 F. Supp. 2d 1001 (E.D. Cal. 2011)...........................................................15

*Am. Impex Corp. v. Int'l Ace Tex, Inc.,*
2009 WL 3963791 (C.D. Cal. Nov. 16, 2009) .................................................28

*Application Grp., Inc. v. Hunter Grp., Inc.,*
61 Cal. App. 4th 881, 72 Cal. Rptr. 2d 73 (1998) .......................................3, 28

*Arthur J. Gallagher & Co. v. Lang,*
2014 WL 2195062 (N.D. Cal. May 23, 2014) .................................................24

*Barahona-Gomez v. Reno,*
167 F.3d 1228 (9th Cir. 1999)..........................................................................27

*Bernard Personnel Consultants, Inc. v. Mazarella,*
1990 WL 124969 (Del.Ch., Aug. 28, 1990) .....................................................26

*Barahona-Gomez v. Reno,*
167 F.3d 1228 (9th Cir. 1999)..........................................................................26

*Cirrus Holding Co. v. Cirrus Indus., Inc.,*
794 A. 2d 1191 (Del. Ch. 2001)........................................................................28

*Curl v. CitiMortgage, Inc.,*
2014 WL 5321063 (N.D. Cal. Oct. 17, 2014) ..................................................21

*Davis v. Romney,*
490 F.2d 1360 (3d Cir. 1974)............................................................................26

*Diodes, Inc. v. Franzen,*
260 Cal.App.2d 244, 255 (1968).......................................................................29

*Flextronics Int'l, Ltd. v. Parametric Tech., Corp.,*
2013 WL 5200175 (N.D. Cal. Sept. 16, 2013) ................................................28

*Henry Schein, Inc. v. Cook,*
2016 WL 3212457 (N.D. Cal. June 10, 2016) .......................................12, 18, 19

*Imax Corp. v. Cinema Techs., Inc.,*
152 F.3d 1161 (9th Cir. 1998)..........................................................................15

*Inspection Mgmt. Sys., Inc. v. Open Door Inspections, Inc.*,
2009 WL 805813 (E.D. Cal. Mar. 26, 2009) ........................................................16

*Int'l Ass'n of Plumbing & Mech. Officials v. Int'l Conference of Bldg. Officials*,
79 F.3d 1153 (9th Cir. 1996) ..............................................................................28

*JBL Enterprises, Inc. v. Jhirmack Enterprises, Inc.*,
698 F.2d 1011 (9th Cir. 1983) ............................................................................22

*Loral Corp v. Moyes*,
174 Cal. App. 3d 274 (1985) ...................................................................... *passim*

*Metro Traffic Control, Inc. v. Shadow Traffic Network*,
22 Cal. App. 4th 853 (1994)................................................................................19

*MSC Software Corp v. Altair Engineering, Inc.*,
2014 WL 4740917 (E.D. Mich. Sept. 23, 2014) .................................................24

*Netlist Inc. v. Diablo Technologies Inc.*,
2015 WL 153724 (N.D. Cal. 2015)......................................................................19

*Occupy Sacramento v. City of Sacramento*,
2011 WL 5374748 (E.D. Cal. Nov. 4, 2011) ......................................................17

*Overstreet v. United Bhd. of Carpenters & Joiners of Am., Local Union No. 1506*,
409 F.3d 1199 (9th Cir. 2005) ............................................................................12

*Perry v. Select Portfolio Servicing, Inc.*,
2015 WL 10943592 (N.D. Cal. Oct. 9, 2015) .....................................................16

*Pyro Spectaculars North, Inc. v. Souza*,
861 F. Supp. 2d 1079 (E.D. Cal. 2012).............................................................27

*Regents of University of California v. American Broadcasting Companies, Inc.*,
747 F.2d 511 (9th Cir. 1984) ..............................................................................28

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
944 F.2d 597 (9th Cir. 1991)..........................................................................27, 28

*Robert Half Int'l, Inc. v. Stenz*,
2000 WL 1716760 (E.D. Pa. Nov. 17, 2000).....................................................29

*Rovio Entertainment, LTD. v. Royal Plush Toys, Inc.*,
907 F. Supp. 2d 1086 (N.D. Cal. 2012) .........................................................12, 17

*Stormans, Inc. v. Selecky*,
586 F.3d 1109 (9th Cir. 2009)............................................................................12

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
240 F.3d 832 (9th Cir. 2001)..............................................................................21

*True N. Commc'ns Inc. v. Publicis S.A.*,
    711 A.2d 34 (Del. Ch. 1997) .......................................................................................28

*Veliz v. Cintas Corp.*,
    2004 WL 2452851 (N.D. Cal. Apr. 5, 2004), modified on reconsideration,
    2005 WL 1048699 (N.D. Cal. May 4, 2005) ...............................................................23

*VL Systems, Inc. v. Unisen, Inc.*,
    152 Cal. App. 4th 708 (2007)......................................................................................24

*Zepeda v. U.S. I.N.S.*,
    753 F.2d 719 (9th Cir. 1983)........................................................................................27

**Statutes**

18 U.S.C.A. § 1839(3) ...........................................................................................................12

18 U.S.C. § 1839(5) ...............................................................................................................12

18 U.S.C. § 1839(6) ...............................................................................................................12

Cal. Bus. & Prof. Code § 16600 ...............................................................................19, 22, 27

I.     **INTRODUCTION**

The Court should deny Plaintiff Zynga, Inc.'s ("Zynga") request for a temporary restraining order ("TRO") against any defendant as Zynga fails to meet the requirements to obtain the emergency relief it seeks.[1]  First, Zynga has presented *no* evidence in its Complaint or TRO application that defendant Scopely, Inc. ("Scopely") has acquired, used, or disclosed Zynga's trade secrets.  Zynga's claims against Scopely are based on speculation—not evidence—and it cannot satisfy any element required for an injunction against Scopely.

Second, Zynga's allegations against Scopely are particularly unfounded considering the extraordinary measures Scopely undertook to ensure that no third party confidential information was disclosed to or used at Scopely when hiring Defendants Massimo Maietti and Ehud Barlach, and Evan Hou and Derek Heck, two former Zynga employees identified (but not named) in the Complaint.  Specifically, Scopely followed this robust and rigorous on-boarding process with hiring these individuals:

- Prior to formalizing the employment relationship, Scopely required each individual to execute an "IP obligations" letter, confirming that the employee will not bring, use, or disclose his or her former employer's confidential information to Scopely.

- Each individual signed a proprietary information agreement, again affirming that he will not use a third party's confidential information at Scopely.

- To further highlight the importance of Scopely's policies related to third party confidential information, each individual also attend a presentation about his confidentiality obligations, or is, alternatively, walked through his obligations with senior management

The above practices—which Scopely follows for *every* new employee—are already far more comprehensive than industry standards, but Scopely did even more.  Knowing Zynga's reputation for litigation against its former employees, Scopely affirmatively retained a third party forensic expert to search for Zynga confidential information in Maietti's and Barlach's personal devices and/or accounts, and to preserve and appropriately remove such information.  Scopely undertook

---

[1] Defendants are mindful of the Court's standing order that oppositions are limited to 15 pages.  However, rather than burdening the Court with three separate 15-page briefs, totaling 45 pages, Defendants submit with the Court's indulgence a single 30-page brief on behalf of all Defendants.  In addition, Defendants request the Court set a hearing for Zynga's application in light of the extraordinary relief Zynga requests without the appropriate evidentiary support.

DEFENDANTS' OPPOSITION TO APPLICATION FOR
TRO AND PRELIMINARY INJUNCTION
CASE NO. 16-CV-06855-VC

1   this forensic investigation proactively, *months before* any litigation or threatened litigation as a

2   prophylactic measure to safeguard against any inadvertent retention of Zynga's confidential

3   information.  And once Zynga filed this action, Scopely again acted quickly and appropriately;

4   the forensic expert immediately collected, preserved, and quarantined Maietti, Barlach, Heck, and

5   Hou's personal and Scopely accounts and devices.

6   Moreover, the initial forensic examination further belies Zynga's claims that Scopely

7   misappropriated Zynga's trade secrets: (i) There is *no* evidence that any USB external device

8   identified in the Complaint including those of Maietti and Barlach has been inserted into the

9   individual's Scopely computer; (ii) Barlach's USB device does *not* contain any Zynga

10  confidential information including the "Hit It Rich!" folder Zynga implied Barlach took; and (iii)

11  There is no evidence that the individuals' corporate Scopely Google Drive accounts or corporate

12  Scopely Google email contains any Zynga confidential information.  Thus, Zynga's speculative

13  allegations do not warrant a TRO against Scopely.

14  Additionally, these reasons further support why the Court should not grant a TRO:

15  •   Maietti no longer has access to any Zynga information.  Therefore, there is no risk of

16      misappropriation that would justify emergency relief.

17  •   Zynga filed this lawsuit *four months* after Maietti left Zynga and waited another month

18      after Zynga's forensics expert began examining Maietti's computer.  Zynga's delay is

        inconsistent with any "emergency" that is required for issuance of any TRO.

19  •   Defendants have already preserved evidence.  Without any evidence that defendants may

20      destroy evidence, there is no basis for a preservation order.

21  Likewise, the Court should deny Zynga's request for an order to show cause and preliminary

22  injunction with respect to the solicitation allegations because:

23  •   California law only supports an employee non-solicitation provision that prohibits the

24      initiation of contact with employees for purposes of hiring them away.  *Loral Corp v.*

        *Moyes*, 174 Cal. App. 3d, 274, 279 (1985).

25  •   Zynga's requested relief—to prohibit "inducing, recruiting, or encouraging"—exceeds

26      both California law and the contract language itself.

27  •   There is no evidence that any individual defendant initiated contact with any Zynga

28      employee for purposes of hiring him or her away.

DEFENDANTS' OPPOSITION TO APPLICATION FOR
TRO AND PRELIMINARY INJUNCTION
CASE NO. 16-CV-06855-VC

- Zynga cannot establish that it will suffer irreparable harm because the loss of employees does not constitute irreparable harm. No amount of discovery will allow Zynga to change this. Accordingly, it makes little sense to issue Zynga's order to show cause and proceed to a preliminary injunction hearing.

For the reasons set forth below, the Court should deny Zynga's application in its entirety.

## II.   STATEMENT OF FACTS

### A.   Scopely Is An Innovative Company Revolutionizing The Gaming Industry

Founded in 2011, Scopely is an innovative Los Angeles-based gaming start-up that has been repeatedly recognized for its achievements. Declaration of Jessica Neal ("Neal Decl.") ¶ 3. Scopely is a global leader in mobile games, not only in developing successful games internally but also in leveraging its proprietary analytics, user acquisition, and product marketing platform to publish games made in partnership with third party developers with whom they do business. *Id.*

Scopely's growth has recently skyrocketed. The company has raised nearly $100 million in financing and the company's projects have been wildly successful. *Id.* For example, Scopely's "Walking Dead" game, based off of the famous graphic novel series surpassed 25 million downloads in its first year. *Id*. At this point, Scopely has had seven consecutive number one games and has a massive network over 100 million users. *Id.* Additionally, Scopely has multiple games that are routinely in the Top 50 and Top 100 "Grossing" games charts out of the millions of apps and games distributed on the (iOS) App Store and Google Play store. *Id*. The industry has taken notice of Scopely's upstart trajectory. *See, e.g.,* Declaration of Catherine Lui ISO Opposition to Application for Temporary Restraining Order and Preliminary Injunction ("Lui Decl."), Ex. A (CNBC article stating: "While Zynga has fallen off a cliff, with a revolving door of executives . . . one start up [Scopely] has quietly built a new kind of mobile game business.").

As a rising star in the gaming industry, Scopely has attracted an influx of new, talented applicants and sparked a period of rapid growth within the company. Deloitte recently named Scopely the #2 "Fastest Growing Technology Company" in North America. Neal Decl., ¶ 3. Given the limited size of the gaming industry and Scopely's potential for growth, Scopely

1    maintains an active and robust recruitment program.  Scopely does not just target specific

2    companies but instead focuses on building relationships across the under-resourced gaming

3    community.  Neal Decl. ¶ 4.  Scopely's recruiting strategy is focused on outreach in the gaming

4    industry, identifying top talent, and building long-term relationships.  Indeed, in the last two

5    years, Scopely has hired employees from 96 different companies.  Neal Decl., ¶ 5.  Contrary to

6    Zynga's allegations that Scopely is targeting Zynga employees, only 5% of those employees

7    came from Zynga (and this calculation includes gaming companies acquired by Zynga during that

8    period).  *Id.*

9        **B.**       **Scopely Undertakes Significant Efforts To Respect Other Companies'**
       **Confidential Information**

10

11         Scopely competes fairly; it does not need or want confidential information from its

12   competitors.  Indeed, Scopely has implemented multiple policies and practices that require its

13   current new-hire employees to respect a third party's confidential information.  For example,

14   when Scopely extends offers to new employees, it also sends a "New Hire IP Obligations Letter"

15   ("New Hire Letter") specifically instructing the employee *not* to bring, use, or disclose any

16   information from their former employers:

17         *Scopely has no need to learn and does not want any proprietary, confidential,*
       *or trade secret information that belongs to your prior employer.*  To minimize
18         the risk that any confidential data belonging to your prior employer could be
       inadvertently used in connection with your employment with Scopely, and to
19         prevent you from being accused of breaching any obligation owed to another
       party, please review and comply with the following ground rules.
20

21         . . . You must *not* disclose your own or any third party's confidential
       information or intellectual property to Scopely.  Further, you are prohibited
22         from retaining any device, data, or document containing the confidential
       information of a prior employer or third party, whether or not created by you.

23         . . . Prior to commencing any work for Scopely, you must conduct a search of
       your personal computers, personal email accounts, smart phones, cloud
24         storage, flash drives, compact discs, DVDs, and any other electronic storage
       devices you possess, as well as any files you maintain in hard copy, for
25         information belonging to your prior employer and information your prior
       employer may claim constitutes proprietary, confidential, or trade secret
26         information.

27         You are instructed to return all proprietary information belonging to your prior
       employer, or arrange with your prior employer for the permanent destruction
28         or deletion from your computer media of any such information or materials.

1   Neal Decl., Ex. A (emphasis added).  Scopely employees are required to sign the New Hire Letter

2   prior to formalizing the employment relationship.  Neal Decl., Exs. A, C, F, H.

3        Scopely also requires each new employee to sign a Proprietary Information and Inventions

4   Agreement ("PIIA").  Neal Decl., ¶ B, D, G, I.  That agreement requires, among other things, that

5   the employee affirm the following:

> I will not violate any agreement with or rights of any third party.  I represent
> that I will not bring with me to the Company or use in the performance of my
> duties for the Company any documents, materials, or information of a former
> employer or third party . . . .  Further, I have not retained anything containing
> any confidential information of a prior employer or other third party, whether
> or not created by me.

10  *Id.*

11       In yet another step, Scopely emphasizes an employee's confidentiality obligations through

12  its training presentations:



22  Neal Decl., Ex. E.  Scopely's new hires each attend this presentation or, alternatively, are

23  specifically walked through these IP obligations by senior management.  Neal Decl., ¶ 10.

24       **C.   Scopely Undertook Comprehensive Precautions To Ensure No Zynga
          Confidential Information Would Be Disclosed To Or Used At Scopely When
25        Hiring Former Zynga Employees**

26       As a company that respects fair competition, Scopely understood the importance of

27  ensuring that no Zynga confidential information would be disclosed to or used at the company

28  when hiring Maietti, Barlach, Hou, and Heck.  Scopely undertook comprehensive measures to

DEFENDANTS' OPPOSITION TO APPLICATION FOR
TRO AND PRELIMINARY INJUNCTION
CASE NO. 16-CV-06855-VC

1   safeguard the company against using or disclosing any confidential Zynga materials.

2          Consistent with Scopely's practices, Maietti, Barlach, Hou, and Heck each signed the

3   New Hire Letter and the PIIA.  Each also attended a presentation regarding his ongoing

4   obligations to Zynga, or alternatively, was specifically walked through his IP obligations by

5   senior management to underscore the importance of these policies to Scopely.  Neal Decl. ¶ 10;

6   Exs. A-I.

7          In addition to its usual confidentiality practices, Scopely took another proactive and

8   precautionary measure by retaining a third party forensic expert, Setec Investigations ("Setec"), in

9   September 2016 to conduct a preliminary investigation regarding  in Maietti's and Barlach's

10  personal devices and/or cloud accounts to identify and eliminate any Zynga confidential material

11  that may have been downloaded to and/or otherwise reside in their devices or cloud accounts over

12  the course and scope of their employment with Zynga.  This is not a practice that companies

13  routinely undertake in the industry to guard against inadvertently obtaining a third party's

14  confidential information.  Scopely undertook these steps *well before* any litigation or threatened

15  litigation by Zynga.  Scopely affirmatively took this prophylactic step—at significant time and

16  expense—to ensure that Scopely would not inadvertently use or disclose Zynga's confidential

17  information.

18         Accordingly, in September and October 2016, Setec searched Maietti's personal laptop

19  and Box.net, Dropbox, and Google Drive and Gmail accounts (through the sync function on

20  Maietti's laptop) for Zynga confidential information.  When Setec occasionally found some old

21  Zynga materials on Maietti's device that appeared to be inadvertently retained, Setec forensically

22  preserved and removed the Zynga information, and then returned the "clean" devices/accounts to

23  Maietti.  Declaration of Michael Kunkel ISO Opposition to Application for Temporary

24  Restraining Order and Preliminary Injunction ("Kunkel Decl."), ¶ 6.  Setec conducted the same

25  process with Barlach's personal Hotmail and Dropbox accounts.  *Id*.  The pre-Complaint

26  investigation by Setec revealed that Barlach's accounts did not contain any Zynga confidential

27  information.  *Id*. ¶ 7.

28

### D.    Scopely Has Collected, Preserved, And Quarantined Potentially Relevant Devices And Accounts

Zynga alleges that Maietti, Barlach, Heck, and Hou may have downloaded and retained Zynga's confidential and trade secret information when leaving Zynga.  Compl. ¶¶ 4-6, 12.  In order to facilitate quick resolution of this action, these individuals transferred their devices and cloud accounts identified in the Complaint to the control of Setec.  Out of an abundance of caution, each also provided other personal devices and accounts that could have potentially come into contact with Zynga confidential information during the course and scope of their employment at Zynga, and Scopely also provided their work laptops and cloud accounts to Setec.  Specifically, the following devices and accounts are now in control of Setec only:

- **Maietti:** The USB external device identified in the Complaint (Compl. ¶ 4), personal computer, personal iPhone, personal iPad, personal Dropbox account, personal Box.net account, Scopely laptop, and Scopely cloud account.

- **Barlach:** The external USB device identified in the Complaint (Compl. ¶ 12), Scopely laptop, and Scopely cloud account.

- **Heck:**  The external USB device identified in the Complaint (Compl. ¶ 12), two additional USB devices, a tower, personal computer, Scopely laptop, and Scopely cloud account.

- **Hou:** The external USB device identified in the Complaint (Compl. ¶ 12), personal computer, tower, Scopely laptop, and Scopely cloud account.

*See* Kunkel Decl. ¶¶ 8-9.  Maietti, Barlach, Heck, and Hou no longer have access to the above devices and account.  Setec has also forensically imaged each of these accounts and devices.

### E.    Zynga Has Not Presented Any Evidence That Scopely Misappropriated Zynga's Information.

Zynga's motion does not identify *any* evidence to suggest that Scopely has acquired Zynga's confidential information through improper means or otherwise.  Instead, Zynga falsely implies without support that Scopely recruited Zynga's employees with some nefarious attempt to obtain trade secret information.  But Scopely's significant and preemptory efforts to insulate itself from such information prove otherwise; Scopely does not need or want Zynga's information.

1    Indeed, Zynga's misappropriation claim against Scopely is entirely tied to its allegation against

2    the individual defendants.  Even then, Zynga relies on only speculation that the former Zynga

3    employees brought Zynga information to Scopely or attempted to use it.

4           Zynga's speculation is unsubstantiated.  Each of the USB devices that Maietti, Barlach,

5    Heck, and Hou allegedly used to download Zynga confidential information has *not* been inserted

6    to or used on these individuals' Scopely laptops.  Kunkel Decl. ¶¶ 13-17.  None of the

7    individuals' corporate Scopely Google Drive accounts, corporate Scopely Google email archiving

8    accounts, or corporate Dropbox accounts—which are the only corporate accounts Scopely

9    provides its employees—contained confidential proprietary Zynga document.  And in any event,

10   all of the devices and accounts have been isolated such that they cannot be accessed by the

11   individuals.  Kunkel Decl. ¶ 9.

12          **F.      Scopely Has Not Used Zynga's Confidential Information**

13          In addition, Scopely has not used any Zynga trade secrets or confidential information.

14                 **1.      Massimo Maietti**

15          Maietti has not used or disclosed to Scopely any Zynga confidential trade secret

16   documents or information in his work with Scopely.  Declaration of Massimo Maietti ISO

17   Opposition to Application for Temporary Restraining Order and Preliminary Injunction ("Maietti

18   Decl."), ¶¶ 4, 6.  Indeed, Zynga's complaint does not allege, and it application for TRO does not

19   cite any evidence showing, that Scopely misappropriated Zynga's purported trade secrets.

20          For example, Zynga alleges that Maietti downloaded Mac-usable working versions of the

21   game he was working on at Zynga on June 24 and June 28, but makes no allegation that Scopely

22   ever received this documents through improper means or othewise.  Compl. ¶ 34.  During this

23   time, Maietti still worked at Zynga and his developers wanted him to download the Mac version

24   for testing purposes.  Maietti Decl., ¶ 3.  Zynga presents no evidence that Maietti kept those

25   programs or somehow transferred them to Scopely.

26          Similarly, Zynga alleges that Maietti downloaded nine zip files to an external USB device

27   on July 4, 2016, before he left Zynga, and that those zip files contain trade secret information.

28   Compl. ¶ 35.  Again, however, Zynga presents no evidence that information is or ever was

1    transferred or disclosed to Scopely.  To the contrary, the external USB devices is now in the sole

2    possession of a forensics expert, Setec, who has found no evidence that it was ever connected to

3    Maietti's Scopely computer.

4         Zynga further alleges that Maietti accessed an additional 13,000 documents related to the

5    Project Mars game on July 7, 2016 and, "on information and belief," copied those files to a Box

6    Sync folder that uploaded the documents to his Box account.  Compl. ¶ 42.  The evidence,

7    however, does not support Zynga's allegation and, even if it did, would not show any

8    misappropriation on behalf of Scopely.  After a preliminary inspection, Setec has not found any

9    evidence indicating that Maietti uploaded 13,000 Project Mars files to his Box account or that

10   Maietti uploaded any other substantial number of documents to his Box account that day.  Kunkel

11   Decl., ¶ 13.  Indeed, it is more likely that Maietti uploaded those documents to Zynga's Google

12   drive just as his supervisor asked him to do before he left.  Dkt. No. 4-14 (Hawley Decl.) ¶ 7 ("I

13   also asked told Maietti to upload all the files, presentations, and documents he had worked on for

14   "Project Mars" onto the Zynga's Google Drive for future access by the team.").

15        Moreover, there would be no reason for Maietti to use Project Mars documents at

16   Scopely.  Maietti currently works on a game in a completely different genre than the Project Mars

17   game.  Zynga contends that information related to Project Mars could be useful in developing a

18   game in the "crime genre" such as a game Scopely is developing based on show *Breaking Bad*.

19   Dkt. No. 4-15 (Koenigsberg Decl.) ¶ 16.  Maietti, however, is not working on a *Breaking Bad*

20   game or any other game in the "crime genre" and has not consulted anyone at Scopely about such

21   a game.  Maietti Decl., ¶ 5.  In fact, at Scopely, Maietti is developing a "general audience Casual

22   PVP game"; the Casual genre means it can be enjoyed through short playing sessions and

23   monetizes modestly from each user.  This type of game is completely different from a crime

24   genre came, which might be designed to appeal to a smaller, mature audience, but demands much

25   higher dedication from its users, both in terms of time spent in the game and daily monetization.

26   *Id.*

27        **2.   Ehud Barlach**

28   Barlach has not used or disclosed any Zynga confidential or trade secret information in his

- 9 -

1    work with Scopely.[2]  Declaration of Ehud Barlach ISO Opposition to Application for Temporary

2    Restraining Order and Preliminary Injunction ("Barlach Decl."), ¶ 6.  The Complaint alleges that

3    Barlach accessed documents related to the game "Hit It Rich!" on August 8, 2016 via Dropbox.

4    Complaint, ¶ 51.  However, in August, Barlach worked on "Hit it Rich" while at Zynga and he

5    accessed those documents during the ordinary course of his work.  Barlach Decl., ¶ 7.  Moreover,

6    his Dropbox account was a Zynga corporate account, and after leaving Zynga, he no longer had

7    access to the account.  *Id*., ¶ 7.  Despite having forensically analyzed Barlach's Zynga computer,

8    Zynga does *not* allege that Barlach transferred those documents to another device before returning

9    his computer.  Barlach did not take those documents with him when he left Zynga, and Zynga

10   does not allege otherwise.  *Id*. ¶¶ 6-7.  Setec's analysis from both before and after Zynga initiated

11   this Complaint confirms the same.  Kunkel Decl. ¶¶ 6-9 and 14-15.

12           The Complaint also alleges that Barlach connected an external USB device to his

13   computer on August 22, 2016 and that "on information and belief" he copied some files related to

14   "Hit It Rich!" to the external USB device.  Compl.¶ 53.  Contrary to these allegations, Barlach

15   only transferred his personal files such as personal photos.  Barlach Decl., ¶ 5.  Setec's forensic

16   investigation did not identify any "Hit It Rich!" or other Zynga confidential information on

17   Barlach's USB drive.  Kunkel Decl., ¶ 14-15.

18           **3.**    <u>Derek Heck and Evan Hou</u>

19           In an attempt to cast its net as wide as possible—and despite a lack of evidence—Zynga

20   also makes allegations of improper behavior against Heck and Hou.[3]  Zynga alleges that Heck

21

22   [2] To be clear, Zynga has not asserted a misappropriation claim against Barlach because there is no
     reasonable basis to do so.  Rather, Zynga implies and alleges "on information and belief" that
23   Barlach may have copied Zynga files prior to his departure.  Those allegations are unfounded.  In
     a weak attempt to bolster its claim against Barlach, Zynga implies that Barlach engaged in
24   secretive practices related to the communication of his departure from Zynga.  However, Barlach
     merely followed the requests from his Zynga supervisor to delay communicating official notice of
25   his departure.  In addition, Barlach did not conceal that he was joining Scopely.  His supervisor
     and three friends knew within approximately a week of Barlach's decision that he would join
26   Scopely.  Barlach Decl. ¶¶ 3-4; Exs. A-B.

27   [3] Plaintiff has not asserted a misappropriation claim against Heck or Hou, or even named them as
     a defendant because there is no reasonable basis to do so.  Rather, Plaintiff implies without
28   alleging that they may have copied Zynga files prior to his departure, but Setec's investigation
     has revealed otherwise.  Compl. ¶¶ 58-59.

1   connected an external USB drive to his Zynga computer on September 3, 2016.  Compl. ¶ 58; Lui

2   Decl. Ex. C (Heck Letter).  The Complaint does not allege (and Zynga's Application for TRO

3   does not cite any evidence) that Heck took any Zynga information or breached any of his

4   agreements.  *Id.*  Setec's forensic investigation reveals Heck's external USB device identified in

5   the Complaint does not contain any confidential Zynga information.  Kunkel Decl., ¶ 16.

6        The Complaint also alleges Hou connected an external USB device to his Zynga work

7   Computer on October 9 and 10 prior to leaving Zynga.  Compl. ¶ 59.  Again, however, Zynga

8   does not bring any allegations or cite any evidence that Hou took any Zynga information or

9   breached any of his agreements.  *Id.*  Zynga sent Hou a letter identifying files that it believed he

10  may have improperly downloaded.  Lui Decl., ¶ D (Hou Letter).  However, Hou's USB device

11  did not contain the Zynga files identified in its letter.  Kunkel Decl., ¶ 17.

12       In sum, Scopely has taken significant steps to take the appropriate and comprehensive

13  steps to ensure the appropriate treatment of third party confidential information.  Zynga has

14  presented no evidence to the contrary.

15       **G.      Maietti And Barlach Have Not Solicited Any Current Zynga Employees**

16       Since their departure from Zynga, Maietti and Barlach have not solicited any current

17  Zynga employee.  Maietti Decl. ¶ 7; Barlach Decl., ¶ 8.  Zynga alleges that Maietti and Barlach

18  must have solicited Hou, Heck, and current Zynga employees Josh Park, Matthew Copeland, and

19  Chuck Hess because, once Maietti and Barlach left Zynga, Scopely contacted these individuals.

20  Compl. ¶¶ 10, 47, 57-59.  However, Scopely had already independently identified each of these

21  individuals and contacted them without the involvement of Maietti or Barlach.  Scopely's

22  recruiting strategy is focused on outreach in the gaming industry, identifying top talent, and

23  building long-term relationships.  It is common for Scopely to contact a candidate multiple times

24  over several years before a candidate agrees to a job interview.  Neal Decl. ¶ 14.  Indeed, in most

25  cases, Scopely had initiated contact with these individuals years before.  For example, Scopely

26  first contacted Park on November 12, 2014 and followed up on December 7, 2014.  *Id.* ¶ 15.

27  When Jessica Neal contacted Park on July 13, 2016, she did so because Park was due for a

28  follow-up contact from Scopely, not because of any direct input from Maietti to Neal.  *Id.* ¶ 15.

1   Moreover, Zynga ignores that Park and Hess both initiated contact with Maietti and Barlach,

2   respectively, about Scopely—not the other way around.  Maietti Decl., ¶ 7; Barlach Decl., ¶ 8.

3   **III.    THE COURT SHOULD NOT ENTER A TEMPORARY RESTRAINING ORDER**
    **AGAINST SCOPELY OR MAIETTI.**

4

5   Zynga requests immediate relief in the form of a temporary restraining order against

6   Scopely and Maietti based on its misappropriation claim.  *See* Dkt. No. 4 (Application for

7   Temporary Restraining Order and Preliminary Injunction) ("Mot.) at Notice of Motion; Dkt. No.

8   6-1 (Proposed Order) at 2.  The Court should deny Zynga's request for the following reasons.

9   **A.    Zynga Cannot Establish the Need for A TRO Against Scopely**

10   The Court should deny Zynga's request for a TRO against Scopely because Zynga has

11   failed to make an adequate showing to warrant such relief.  "The proper legal standard for

12   preliminary injunctive relief requires a party to demonstrate (1) that he is likely to succeed on the

13   merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that

14   the balance of equities tips in his favor, and (4) that an injunction is in the public interest."

15   *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009).  To grant a TRO, a court must

16   find that "a certain threshold showing is made on each factor."  *Henry Schein, Inc. v. Cook*, No.

17   16-CV-03166-JST, 2016 WL 3212457, at *2 (N.D. Cal. June 10, 2016) (citing *Leiva–Perez v.

18   Holder*, 640 F.3d 962, 966 (9th Cir. 2011)).  The Court has discretion to balance the four factors

19   in determining whether they weigh in favor of extraordinary relief.  At minimum, "a moving

20   party must show either a combination of probable success on the merits and the possibility of

21   irreparable harm or serious questions going to the merits, the balance of hardships tipping sharply

22   in its favor, and at least a fair chance of success on the merits."  *Overstreet v. United Bhd. of

23   Carpenters & Joiners of Am., Local Union No. 1506*, 409 F.3d 1199, 1207 (9th Cir. 2005).  "A

24   restraining order is 'an extraordinary remedy that may only be awarded upon a clear showing that

25   the plaintiff is entitled to such relief.'"  *Rovio Entertainment, LTD. V. Royal Plush Toys, Inc.*, 907

26   F. Supp. 2d 1086, 1093 (N.D. Cal. 2012) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S.

27   7, 22 (2008)).

28

DEFENDANTS' OPPOSITION TO APPLICATION FOR
TRO AND PRELIMINARY INJUNCTION
CASE NO. 16-CV-06855-VC

1

**1.** <u>Zynga has not demonstrated a likelihood of success on the merits of its misappropriation claim against Scopely.</u>

2

3      Zynga's application falls hopelessly short of establishing a likelihood of success on the

4  merits of its claim for trade secret misappropriation against Scopely under the Defend Trade

5  Secrets Act (DTSA).  The DTSA defines a trade secret as information for which:

6          (A) the owner thereof has taken reasonable measures to keep such information
           secret; and

7          (B) the information derives independent economic value, actual or potential, from
           not being generally known to, and not being readily ascertainable through

8          proper means by, another person who can obtain economic value from the
           disclosure or use of the information.

9

10  18 U.S.C.A. § 1839(3).  The DTSA defines "misappropriation" as acquisition of a trade secret

11  through "improper means" or "disclosure or use of a trade secret "without express or implied

12  consent" by one who:

13          (i) used improper means to acquire knowledge of the trade secret; (ii) at the time of
           disclosure or use, knew or had reason to know that the knowledge of the trade

14          secret was (I) derived from or through a person who had used improper means to
           acquire the trade secret; (II) acquired under circumstances giving rise to a duty to

15          maintain the secrecy of the trade secret or limit the use of the trade secret; or (III)
           derived from or through a person who owed a duty to the person seeking relief to

16          maintain the secrecy of the trade secret or limit the use of the trade secret;…

17

18  18 U.S.C. § 1839(5).  "Improper means" includes "theft, bribery, misrepresentation, breach or

19  inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other

20  means."  18 U.S.C. § 1839(6).

21                  **a.**   *Zynga Submits No Evidence that Scopely Misappropriated or Even
                        Received Zynga's Confidential Trade Secret Information.*

22

23      Zynga has not presented *any* evidence that Scopely misappropriated Zynga's confidential

24  or trade secret information.  Instead, Zynga presents evidence that *Maietti* may have downloaded

25  and retained Zynga's information to an "external USB device" prior to leaving Zynga.  Mot. at 3-

26  7.  Zynga then speculates, without explanation or evidence, that this "is sufficient evidence of

27  Defendants' [including Scopely's] misconduct to justify injunctive relief."  Mot. at 15.  But

28  Zynga's conclusion is unsupported.  There is not one piece of evidence in the record that Maietti

1    provided or disclosed the confidential information to Scopely.

2            To the contrary, with this opposition, Scopely has submitted substantial evidence that it

3    did not want Zynga's confidential information and that it went to great lengths to insulate itself

4    from that information.  Preliminarily, Maietti had no such need for the "Project Mars"

5    information Zynga identifies.  Maietti is not working on game that competes with the "Project

6    Mars" game he was working on at Zynga and, in fact, is not even working in the same genre of

7    game.  Maietti Decl., ¶ 5.

8            More importantly, however, Scopely has presented evidence that (1) it takes significant

9    proactive and prophylactic measures to insulate itself from other companies' confidential

10   information; and (2) it implemented those measures when hiring Maietti.  Scopely made it very

11   clear to Maietti early and often (as it does with all of its new employees) that it did not need or

12   want any confidential information from Maietti's former employer and that Maietti was forbidden

13   from bringing, using, or disclosing such information when he came to Scopely.  Neal Decl., Ex.

14   A-B, E and ¶ 10.  Scopely told Maietti in the New Hire Letter, the PIIA Agreement, and in the

15   onboarding process of Maietti's obligations regarding third party confidential information.  Neal

16   Decl., ¶ 10.  Scopely then retained Setec at its own expense to examine certain of Maietti's

17   devices/accounts and purge them of any Zynga confidential information that may have been

18   inadvertently retained well in advance of Zynga's initiation of this action.  Kunkel Decl., ¶¶ 6-7.

19   These efforts, which Scopely took prior to the threat of litigation, completely negate any possible

20   inference that Scopely obtained Zynga's confidential information from Maietti "through improper

21   means" or with knowledge that the information was obtained through improper means.  Indeed,

22   Zynga has not presented any evidence that Scopely obtained the information at all.  Moreover,

23   there is affirmative evidence that (i) the USB external device identified in Zynga's complaint was

24   not inserted into Maietti's Scopely computer; and (ii) that Maietti's corporate Scopely Google

25   Drive accounts or corporate Scopely Google email archiving accounts do not contain confidential

26   proprietary Zynga documents.  Kunkel Decl. ¶¶ 13-17.

27           Accordingly, Zynga has created a record with a complete failure of proof as to a key

28   element of its misappropriation claim (the misappropriation element), and Zynga has not and

- 14 -

1    cannot demonstrate a likelihood of success.

2              **b.**      *Zynga Has Failed to Demonstrate Protectable Trade Secrets.*

3              Independently, Zynga has also failed to adequately identify any protectable trade secrets.

4    In determining whether to enjoin alleged misappropriation, Courts require plaintiffs to

5    demonstrate *particular* trade secrets.  *Agency Solutions.com, LLC v. TriZetto Group, Inc.*, 819 F.

6    Supp. 2d 1001, 1015 (E.D. Cal. 2011) ("To avoid the 'vague hand waiving' that the court is

7    cautioned against, the plaintiff is burdened to make two showings.  First, the plaintiff must clearly

8    identify what the 'thing' is that is alleged to be a trade secret, and second, the plaintiff must be

9    able to clearly articulate why that 'thing' belongs in the legal category of trade secret."); *Imax*

10   *Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164–65 (9th Cir. 1998) ("The plaintiff should

11   describe the subject matter of the trade secret with sufficient particularity to separate it from

12   matters of general knowledge in the trade or of special knowledge of those persons ... skilled in

13   the trade.") (internal quotations omitted).[4]  Zynga claims that certain documents (primarily

14   "marketing and design information") constitute trade secrets, but fails to present any evidence

15   disclosing the details of those trade secrets.  *See* Mot. at 11-12.

16             Instead of submitting the actual trade secrets to the Court for determination, Zynga instead

17   relies on vague declarations to argue—in conclusory fashion—that the information at issue is "not

18   generally known."  Mot. at 12 (citing Koenigsberg Decl., ¶¶ 16-24).  But Zynga's declarations are

19   not sufficient to establish trade secrets.  Indeed, the declarations primarily discuss design

20   information for games that have been in the public domain for years.  (Koenigsberg Decl., ¶¶ 16-

21   24 (discussing, *e.g.*, FarmVille2, which was released in 2012).  Zynga contends that some of the

22   information is not stale because it relates to an unreleased game, "Project Mars," but the

23   allegations testimony regarding those files are vague and conclusory.  Mot at 12; *See e.g.*,

24   Koenigsberg Decl., ¶ 16 ("The Project Mars folder contains extensive critical and sensitive

25   documentation related to design and marketing.").  The Court should not be required to rely on

26

27   _____

[4] As Zynga acknowledges, The DTSA's provisions mirror those of the UTSA and, accordingly,
28   courts may borrow from decisions on trade secret misappropriation in California when
     interpreting the DTSA.

DEFENDANTS' OPPOSITION TO APPLICATION FOR
TRO AND PRELIMINARY INJUNCTION
CASE NO. 16-CV-06855-VC

1    Zynga's conclusory statements.

2             **2.**     <u>Zynga has not demonstrated that it is likely to suffer irreparable harm in the</u>
3                   <u>absence of an injunction against Scopely.</u>

4       Zynga's request for a TRO also fails because Zynga has not demonstrated that it will be

5 irreparably harmed if the Court does not enjoin Scopely.  "Courts have consistently identified a

6 showing of likely irreparable harm as the single most important prerequisite for the issuance of a

7 preliminary injunction; Plaintiff must make that showing before the other requirement for the

8 issuance of a preliminary injunction need even be considered."  *Inspection Mgmt. Sys., Inc. v.*

9 *Open Door Inspections, Inc.*, 2009 WL 805813, at *3 (E.D. Cal. Mar. 26, 2009).

10             **a.**     *There is no risk that Scopely Will Use Zynga's Trade Secret*
11                   *Information Because Scopely Does Not Have Such Information.*

12       Here, Zynga cannot demonstrate that it is likely to suffer *any* harm, let alone irreparable

13 harm, absent an injunction.  Zynga's sole hypothetical scenario of irreparable harm—that Scopely

14 may use Zynga's trade secrets by incorporating them into a Scopely game—is completely

15 unsubstantiated.  Zynga alleges no facts to support any claim that Scopely has misappropriated

16 Zynga's trade secrets.  *See also* section III.A.1.a, *supra*.

17             **b.**     *Zynga's Delay Negates Its Claim of Irreparable Harm.*

18       Additionally, Zynga can hardly argue that it will suffer irreparable harm given the amount

19 of time Zynga delayed here.  *See Perry v. Select Portfolio Servicing, Inc.*, 2015 WL 10943592, at

20 *1 (N.D. Cal. Oct. 9, 2015) ("A delay in seeking a preliminary injunction is a factor to be

21 considered in weighing the propriety of relief.") (quoting *Lydo Enterprises, Inc. v. City of Las*

22 *Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984); *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762

23 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction

24 implies a lack of urgency and irreparable harm.")).

25       Maietti left Zynga in July 2016 and returned his Zynga computer at that time.  Zynga

26 knew Maietti was going to Scopely and, in fact, terminated him immediately.  Dkt. No. 4-14

27 (Hawley Decl.) ¶ 8.  Nonetheless, Zynga waited for over *four months* to bring this application,

28 forcing Defendants' to respond in a matter of days.  Such a delay is inconsistent with a request for

emergency relief through a TRO:

> Parties spurred on by the threat of or actual immediate irreparable harm file for TROs as quickly as possible to head or stave it off.  *See, e.g., In re Excel Innovations, Inc.*, 502 F.3d 1086, 1091 (9th Cir. 2007) (zero days delay); *Lands Council v. Martin*, 479 F.3d 636, 638–639 (9th Cir. 2007) (one day delay); *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1155–1156 (9th Cir. 2006) (ten days delay); *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S.D.A.*, 415 F.3d 1078, 1089 (9th Cir. 2005) (six days delay); *Duke Energy Trading and Mktg., L.L.C. v. Davis*, 267 F.3d 1042, 1048 (9th Cir. 2001) (two days delay). Here, in stark contrast, Plaintiff has been aware of the alleged counterfeiting activities since at least April 2012, but did not file suit until October 29, 2012.

*Rovio Entm't Ltd. v. Royal Plush Toys, Inc.*, 907 F. Supp. 2d at 1097.

Zynga may argue that it did not have reason to discover that Maietti had taken confidential information until Scopely hired other Zynga employees, but the Court should reject that argument. Barlach and Heck left in early September and Zynga *still* waited over a month to take action. Indeed, Zynga did not retain experts to examine Maietti's laptop until late October (months after Maietti and Barlach announced they were leaving) and, even then, still waited *another* month to seek relief.  *See* Maugeri Decl., ¶ 6.

Now, Zynga seeks "emergency" relief.  Such delay—even when less than a month—have been found to be improper for purposes of a temporary restraining order.  *See Occupy Sacramento v. City of Sacramento*, 2011 WL 5374748, at *4 (E.D. Cal. Nov. 4, 2011) ("Stated another way, the Court is of the view that the twenty-five day delay between Judge Connelly's Order and the filing of this action contradicts plaintiff's claims of irreparable injury if the TRO does not issue and that under the circumstances here, twenty-five days constitutes undue delay.").

**3.**　　Zynga has not demonstrated that the equities tip in favor of an injunction.

In addressing this factor, Zynga does not contend that it would experience any hardship if the Court were not to enter an injunction.  Mot. at 18.  Rather, it simply argues that Scopely will also not experience any hardship because it will merely have to comply with the law and, therefore, an injunction should issue.  *Id.*  The Court should reject this for several reasons.

*First,* the fact that an injunction only requires compliance with the law does not automatically mean that is should be issued.  If that is the rule, then the Court could just as easily

1    issue an order against Zynga enjoining it from misappropriating Scopely's trade secrets.

2           *Second,* and contrary to Zynga's representations, issuing a TRO against Scopely will

3    cause Scopely unnecessary hardship.  This case has already become very public because

4    (presumably) Zynga leaked the story to the press immediately after filing the complaint.  *See* Lui

5    Decl., Ex. B.  In light of that publicity, an order enjoining Scopely from misappropriating

6    competitor information would surely spread through the media and undoubtedly cast a cloud over

7    Scopely's reputation.  Such a stigma could potentially chill Scopely's ability to attract new talent

8    and investors at a key time during Scopely's growth.  Zynga surely knows this and has likely used

9    this action as a pretext for stemming the tide of its employee leaving the company over the past

10   few years.  Those consequences would be particularly unfair here because (1) Zynga has

11   presented absolutely *no evidence* that Scopely misappropriated (or even received) Zynga's

12   alleged trade secrets and (2) Scopely undertook significant proactive measure to ensure that it *did*

13   *not* receive Zynga's trade secrets.

14          The cases cited by Zynga are inapposite.  Indeed, Zynga relies heavily on *Henry Schein,*

15   *Inc. v. Cook*, but that case actually weighs *against* issuing an order against Scopely.  2016 WL

16   3212457, at *1.  In *Henry Schein*, the plaintiff sought a temporary restraining order against the

17   employee alleged to have taken the plaintiff's trade secret information **only**.  *Id.*  The plaintiff

18   correctly declined to seek a temporary restraining order or preliminary injunction against the

19   defendant's employer because there was no evidence the employer obtained the trade secrets and,

20   consequently, no reasonable basis for such a request.  *See id.*  The equities did not weigh in favor

21   of injunctive relief against the employer because the employer had nothing to do with the alleged

22   trade secrets.  Here, as in *Henry Schein*, there is no basis to request injunctive relief against

23   Scopely.

24          **4.**     <u>Zynga has not demonstrated that an injunction is in the public interest.</u>

25          Similarly, the public interest would not be served by an order against Scopely here.

26   Zynga's only argument that an injunction would serve the public interest is that the order would

27   "enabl[e] the protection of trade secrets."  Mot. at 19.  Zynga's argument is incorrect because, to

28   the extent any of the devices identified in the complaint contain Zynga's trade secrets, those

1    devices have already been preserved and protected.  Also, Zynga's argument again relies on

2    *Henry Shein*, which contradicts Zynga's argument.  *Id.*  The *Henry Schein* court did not find that

3    injunctive relief against the defendant's *employer* (who had no involvement) would enable the

4    protection of trade secrets and did *not* issue an order against the employer.  *See Id.*  Similarly, this

5    court should not issue an order against Scopely.

6         Moreover, "the public interest inquiry primarily addresses the impact on non-parties

7    rather than parties" and Zynga's requested relief will have absolutely no effect on the ability of

8    non-parties to protect their trade secrets.  *Netlist Inc. v. Diablo Technologies Inc.*, No. 13-CV-

9    05962-YGR, 2015 WL 153724, at *9 (N.D. Cal., 2015).  The injunction could, however, have

10   chilling effect on legitimate hiring and employee mobility that would negatively affect non-party

11   employers and employees.  As explained above, Scopely has gone out of its way to implement

12   policies and practices that insulate it from the confidential information of other companies.  That

13   type of proactive behavior on behalf of companies should be rewarded, not punished.  Issuing an

14   order against Scopely would indicate that companies can still be subject to substantial risk of

15   adverse legal consequences even when (1) they have implemented significant prophylactic

16   measures to avoid trade secret information and (2) there is absolutely no evidence of company

17   wrongdoing.  Such an effect would be inconsistent with California's strong public policy in favor

18   of employee mobility.  *See* Cal. Bus. & Prof. Code § 16600; *Metro Traffic Control, Inc. v.*

19   *Shadow Traffic Network*, 22 Cal. App. 4th 853, 859-60 (1994) (finding non-competition

20   agreement unenforceable where it restricted employee mobility).

21        **B.      The Court Should Not Enter a TRO Against Massimo Maietti**

22        The Court should also deny Zynga's request for a TRO against Maietti.  As explained

23   above, the most important factor at issue is irreparable harm and Zynga cannot make any showing

24   on that factor.  Regardless of whether Maietti retained Zynga's information when he left, there is

25   no evidence that he used the information or disclosed it to Scopely personnel.  Kunkel Decl., ¶¶

26   11-13; Maietti Decl. ¶ 6.  Moreover, even assuming Maietti downloaded Zynga information to his

27   external USB device and his Box.net account when he left the company, Setec has collected,

28   preserved, and isolated those devices and accounts.  Maietti can no longer access the information

1   and there is no risk Scopely will use it.  Kunkel Decl., ¶ 9.  Likewise, Zynga's delay in pursuing

2   this action against Maietti is inconsistent with any "emergency" that would support a TRO

3   against him.

4         Moreover, the balance of hardships tips in Maietti's favor because a court order issued

5   against him may impede his ability to find employment in the future.  This case is already in the

6   public eye, presumably because Zynga leaked it to the press.  Lui Decl., Ex. B.  As a result of that

7   decision, the first link to appear when searching for "Massimo Maietti" on Google—other than

8   his LinkedIn profile—is an article discussing the lawsuit against him.  A court order against

9   Maietti would only add to that stigma, and it would be unnecessary because Maietti has

10  voluntarily turned over all of his devices.  Accordingly, the Court should exercise its discretion to

11  decline Zynga's request for extraordinary injunctive relief against Maietti.

12  **IV.    THE COURT SHOULD DENY ZYNGA'S REQUEST FOR AN ORDER TO SHOW
         CAUSE AND PRELIMINARY INJUNCTION.**

13

14        In addition to seeking a TRO based on its claims for misappropriation, Zynga also seeks

15  an order to show cause setting a hearing for preliminary injunction on all of its claims.

16  Specifically, Zynga requests an order to show cause and preliminary injunction seeking the

17  following relief:

18       1.  Enjoining Scopely and Maietti's from using or disclosing Zynga's confidential
            information based on its claim for misappropriation of trade secrets;

19

20       2.  Enjoining Defendants Maietti and Barlach from directly or indirectly soliciting,
            recruiting, encouraging or inducing any Zynga employee to terminate his or her
            employment relationship based on its claims for breach of contract; and

21

22       3.  Enjoining Scopely from encouraging, causing, or permitting Maietti, Barlach, or
            any other current or former Zynga employee from violating their contractual
            obligations to Zynga based on its claims for tortious interference with contract.

23

24  Proposed Order at 1-2.  As explained below, there is no basis for an order to show cause or a

    preliminary injunction because Zynga cannot prove it is entitled to injunctive relief.

25

26       **A.    The Court Should Not Enter An Order To Show Cause or Preliminary
         Injunction Based On Zynga's Misappropriation Claims.**

27

28       The first part of Zynga's requested preliminary injunction seeks the same relief it sought

- 20 -

1    in its TRO (except for longer duration).  *See* Proposed Order.  The Court should deny this request

2    for the reasons Scopely articulated in section III with respect to the TRO.  *Stuhlbarg Int'l Sales*

3    *Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001) (The standard that governs

4    the issuance of a preliminary injunction is "substantially identical" to the standard that governs

5    the issuance of a temporary restraining order).

6            Moreover, for the reasons stated in Scopely's concurrently filed Opposition to Plaintiff's

7    Motion for Expedited Discovery, the Court should also reject Zynga's contention that it needs

8    expedited discovery and more time to support its request for preliminary injunctive relief.

9    Critically, Zynga cannot establish that it is likely to suffer irreparable harm given the proactive

10   prophylactic measures that Scopely has taken to insulate itself from Zynga's information and

11   isolate the devices Zynga alleges contain its information.  No amount of expedited discovery will

12   resolve that deficiency.

13       **B.      The Court Should Not Enter An Order Based On Zynga's Breach of Contract
                   Claims and Tortious Interference Claims.**
14

15           Zynga requests an order to show cause and preliminary injunction enjoining Maietti and

16   Barlach from "directly or indirectly, soliciting, recruiting, encouraging or inducing any Zynga

17   employee to terminate his or her employment with Zynga" and enjoining Scopely from

18   encouraging or permitting them to do so.  Proposed Order at 1.  This request is based on its claims

19   for breach of contract and tortious interference.  *Id.*  Zynga, however, cannot demonstrate a

20   likelihood of success on these claims because the agreements are unlawful and Maietti and

21   Barlach did not directly or indirectly solicit Zynga's employees.  Moreover, Zynga cannot

22   demonstrate that it is likely to suffer irreparable harm or that the other equitable factors weigh in

23   its favor, and no amount of expedited discovery will resolve those deficiencies.

24       **1.      <u>Zynga Cannot Show That It Is Likely To Succeed on it Claims For Breach
                    Of Contract Or Tortious Interference.</u>**
25

26           The elements of a breach of contract cause of action are the (1) existence of the contract,

27   (2) performance by the plaintiff or excuse for nonperformance, (3) breach by the defendant and

28   (4) resulting damages.  *Curl v. CitiMortgage, Inc.*, 2014 WL 5321063, at *2 (N.D. Cal. Oct. 17,

- 21 -

1   2014).  Like a breach of contract claim, a claim for tortious interference with contract also

2   requires a valid contract and an actual breach or disruption of the contractual relationship.  *JBL*

3   *Enterprises, Inc. v. Jhirmack Enterprises, Inc.*, 698 F.2d 1011, 1019 (9th Cir. 1983)

4       Zynga alleges two separate breach of contract theories.  First, it alleges that the individual

5   defendants breached Zynga's "Termination Certifications."  *See* Compl. ¶¶ 45, 55.  Second, it

6   alleges that Maietti and Barlach breached Zynga's Employment Invention Assignment and

7   Confidentiality Agreement ("EIACA").  *See* Complaint, ¶¶ 32, 48.  For the following reasons,

8   however, Zynga cannot prove a likelihood of success on either claim.

9           **a.**     *Zynga Cannot Show That It Is Likely to Succeed on it Claim For*
             *Breach of the "Termination Certificates."*
10

11      Zynga alleges that Maietti and Barlach breached their Termination Certificates with

12  Zynga.  Complaint ¶¶ 78-80, 85-87.  Zynga's Termination Certificates are one-page documents

13  that generally certify that a departing employee has complied with his or her preexisting

14  obligations *except* that they also include one additional, non-preexisting term that the employee

15  must agree to.  *See* Esposito Decl., Ex. C (Maietti Certification); Ex. E (Barlach Certification).

16  Specifically, they require the employee to "further agree that for twelve (12) months from this

17  date, I will not, directly or indirectly, solicit, induce, recruit or encourage any of the Company's

18  employees to leave their employment."  *Id.*  This provision does not exist in any of the

19  employee's previous agreements.[5]

20      Zynga cannot demonstrate a likelihood of success on the merits of this claim because the

21  Termination Certificates are void for at least two reasons.  *First*, the Termination Certificates

22  exceed the scope of the original employment agreements, and lack consideration for the

23  additional scope.  It is axiomatic that every executory contract requires consideration.  1 Witkin,

24  Summary 10th Contracts § 202 (2005).  In many cases, an offer of employment or the continued

25  opportunity to remain employed in exchange for signature of an agreement may constitute legal

26  _____

27  [5] As explained in section IV.B.1, below, the non-solicit provision in the Zynga EIACA prohibits
    the employees from "directly or indirectly solicit[ing] away employees or consultants of the
    Company," but not from *inducing, recruiting, or encouraging*, which is a material distinction.
28  *See* Esposito Decl. Ex. A at ¶ 13 (Massimo EIACA); Ex. D at ¶13 (Ehud EIACA).

1    consideration.  *Veliz v. Cintas Corp.*, 2004 WL 2452851, at *11 (N.D. Cal. Apr. 5, 2004),

2    modified on reconsideration, 2005 WL 1048699 (N.D. Cal. May 4, 2005) (citing *McClendon v.*

3    *Sherwin–Williams, Inc.*, 70 F. Supp. 2d 940, 943 (E.D. Ark. 1999) ("by choosing to remain an

4    employee with Sherwin–Williams after having received the employee handbook and by

5    continuing to stay on the job, plaintiff supplied the consideration for the offer.").  However,

6    continued employment cannot serve as consideration for new contract provisions included for the

7    first time in a termination certification because the employee is no longer being employed.

8         That is the case here.  Maietti's and Barlach's employment agreements prohibited them

9    only from "directly or indirectly solicit[ing]" plaintiff's employees.  Docket No. 4-3 at 5, ¶ 13.

10   Yet, the Termination Certifications attempt to forbid them "directly or indirectly, solicit[ing],

11   induc[ing], recruit[ing] or encourage[ing]" plaintiff's employees to leave their employment.

12   Docket No. 4-4 at 2.  Accordingly, Plaintiff's Termination Certifications introduce new terms to

13   the parties' relationship with nothing of value in exchange, and are therefore void.

14        *Second,* even were the Termination Certificates sufficiently supported by consideration—

15   they were not—they would still be void as against public policy.  Consistent with Cal. Bus. &

16   Prof. Code § 16600, "California has a strong interest in protecting the freedom of movement of

17   persons whom California-based employers . . . wish to employ."  *Application Group*, 61 Cal.

18   App. 4th at 900-901.  Covenants that prohibit a company from hiring employees from a

19   competitor are therefore void.  *See, e.g., VL Systems, Inc. v. Unisen, Inc.*, 152 Cal. App. 4th 708,

20   713-714 (2007).  Given this strong public policy, California courts narrowly construe non-

21   solicitation provisions to prohibit only the initiation of contact.  *Loral Corp v. Moyes*, 174 Cal.

22   App. 3d, 274, 279 (1985) ("This restriction only slightly affects Conic employees.  They are not

23   hampered from seeking employment with Aydin nor from contacting Moyes.  *All they lose is the*

24   *option of being contacted by him first.*") (emphasis added); *Aetna Bldg. Maintenance Co. v. West*,

25   39 Cal. 2d 198, 203 (1952) ("'Solicit' is defined as: 'To ask for with earnestness, to make petition

26   to, to endeavor to obtain, to awake or excite to action, to appeal to, or to invite.  It implies

27   personal petition and importunity addressed to a particular individual to do some particular thing,

28   . . . .'") (internal citations omitted).  Courts render void contracts that prohibit more than initiating

1    contact, *e.g.*, engaging in the hiring process *after* the departed employee has been contacted by a

2    former colleague.  *Loral*, 174 Cal. App. 3d at 279 ("Equity will not enjoin a former employee

3    from receiving and considering applications from employees of his former employer, even though

4    the circumstances be such that he should be enjoined from soliciting their applications.")

5          Zynga's Termination Certificates prohibit, among other things, "indirectly"

6    "encourage[ing]" Zynga employees to leave Zynga.  This is clearly overbroad and invalid under

7    California law.  It would prohibit, for example, Maietti from describing Scopely in a positive light

8    to a Zynga employee even *after* that Zynga employee contacted Maietti and asked about Scopely.

9    It would similarly preclude Maietti from offering a job to anyone at Zynga—even after they have

10   approached him—because that would "encourage" the person to leave Zynga.  Such a provision is

11   equivalent to a "no-hire" provisions, which is undisputedly invalid under California law.  *VL*

12   *Systems*, 152 Cal. App. 4th at 715.

13         The cases Zynga cites are inapposite.  Zynga cites, for example, *Arthur J. Gallagher &*

14   *Co. v. Lang*, 2014 WL 2195062, at *1 (N.D. Cal. May 23, 2014).  In that case, the non-solicit

15   provision only stated the employee would not "directly solicit, induce or recruit an employee."

16   *Id.*  It did not preclude encouragement, indirect encouragement, or any other indirect actions like

17   the provision in Zynga's Termination Certificates.  Zynga also cites *MSC Software Corp v. Altair*

18   *Engineering, Inc.*, 2014 WL 4740917 (E.D. Mich. Sept. 23, 2014), but that case was not decided

19   by a California Court and is not binding.  Moreover the Court did not consider the effect of

20   broadly prohibiting an employee from "indirectly" "encouraging" an employee and recent

21   California case law indicates that non-solicits may soon be completely unenforceable.

22   Accordingly, the provision in Zynga's Termination Certificate is unenforceable and Zynga cannot

23   demonstrate a likelihood of succeeding on its claim that Maietti and Barlach breached that

24   provision.

25                    **b.**     *Zynga Cannot Show That It Is Likely to Succeed On Its claims for*
                                *Breach of the EIACA.*
26

27         Zynga also contends that Maietti and Barlach breached the non-solicit provision of the

28   EIACA.  Mot. at 21.  That provision precludes Maietti and Barlach from "directly or indirectly

1   solicit[ing] away employees or consultants of the Company . . . ." either during their employment

2   or for a period of one year thereafter.  *See* Esposito Decl. Ex. A at ¶ 13 (Massimo EIACA); Ex. D

3   at ¶13 (Ehud EIACA).  Zynga's Complaint alleges on information and belief that Maietti and

4   Barlach breached this provision by instructing Scopely to initiate contact with several Zynga

5   employees: Josh Park, Matthew Copeland, Chuck Hess, Derek Copeland, or Evan Hou.

6   Compl.¶¶ 45-47, 57.

7        Zynga has failed to demonstrate a likelihood of success on this claim because it cannot

8   demonstrate that Maietti or Barlach breached the non-solicitation provision.  As explained above,

9   courts have interpreted provisions prohibiting "solicitation" of employees to prevent an employee

10   from initiating contact with those employees.  *Loral*, 174 Cal. App. 3d. at 279.  Here, however,

11   neither Maietti nor Barlach initiated contact, directly or indirectly, with the Zynga employees

12   below and therefore did not solicit them.  Each of the employees at issue were already in

13   Scopely's pipeline before Maietti and Barlach joined Scopely.  Neal Decl., ¶ 12.  In fact, as

14   described below, other Scopely employees first contacted the Zynga employees without

15   instruction from Maietti and Barlach and, for the most part, did so long before Maietti and

16   Barlach started at Scopely.  Neal Decl., ¶ 12.

17   • **Joshua Park.**  Zynga implies that Maietti instructed Scopely to contact Park because

18        Scopely Chief People Officer, Jessica Neal, contacted Park the day after Maietti

19        signed his Termination Certificate.  Compl.¶¶ 45-47.  Not true.  Neal contacted Park

20        based on Scopely's recruiting department's network and relationships with those in the

21        gaming industry.  Neal Decl., ¶ 12.  She did so without any direct input from Maietti

22        to Neal.  *Id.*  It was only *after* Park contacted Maietti to tell him that he was

23        interviewing with Scopely that Maietti became involved in the process.  Maietti Decl.,

24        ¶ 7 and Ex. A (From Park to Maietti, "Hope things are going well for you!  Wanted to

25        give you the heads up that I'll be heading down to talk to some people at Scopely for a

26        PM role sometime in the next week or so.")  Indeed, Park himself admits that he was

27        the one that initiated contact with Maietti.  Park Decl., ¶ 8 ("Before my interviews at

28        Scopely, I contacted Maietti to discuss his experience at Scopely.")

- 25 -

- **Derek Heck.** Scopely employee Christopher Kale first contacted Heck in December 2014 and Heck first responded on December 7, 2014. Neal Decl., ¶ 12.
- **Matthew Copeland**. Scopely employee Jordan Mazer first contacted Copeland on September 23, 2014. Neal Decl., ¶ 12.
- **Evan Hou.** Scopely employee Christopher Kale first contacted Hou on July 5, 2016. Neal Decl., ¶ 12. Scopely did not contact Hou because of any involvement by Maietti or Barlach; rather, Scopely contacted Hou based on the HR department's own research. *Id.* Moreover, Hou ultimately came to Scopely for a job interview through a recruiting agency called CyberCoders and Scopely paid a fee to CyberCoders for hiring Hou. *Id.*
- **Chuck Hess**. Scopely employee Christopher Kale first contacted Hess on October 19, 2016. Neal Decl., ¶ 12. Although this occurred after Barlach started at Scopely, Scopely did not contact Hess at Barlach's direction. Neal Decl., ¶ 12. Indeed, Hess contacted Barlach about Scopely *after* Kale had already contacted Hess. Barlach Decl., Ex. C.

Zynga relies heavily on Barlach's text message offering to "consult" with Scopely on potential candidates to suggest solicitation. Compl.¶ 52. Barlach's offer to consult with candidates that Scopely was already considering, however, does not constitute a breach of his non-solicit agreement. Barlach did not initiate contact with these individuals (directly or indirectly) and, accordingly, did not solicit them in violation of his agreement. Similarly, Dunbar's message back to Barlach does not change the fact that Barlach did not initiate contact with these employees.

        **c.**     *Zynga's Proposed Order Violates California Law and Defendants' Agreements.*

Even if Zynga could demonstrate a likelihood of success on its claim for breach of the EIACA, that would still not support Zynga's requested relief because Zynga's proposed injunction goes far beyond what is permitted under California law. As explained above, California law will only enforce an agreement that prohibits a solicitation *i.e.,* the initiation of

1  contact with employment candidates.  Agreements that prohibit anything more than that are void

2  and unenforceable.

3       Zynga's proposed preliminary injunction not only seeks to expand California law, but it

4  seeks to expand the individual defendants' contractual obligations.  A preliminary injunction is

5  "but a device for preserving the status quo and preventing the irreparable loss of rights before

6  judgment." *Beauchamp v. Los Angeles Cty. Metro. Transp. Authority*, 191 F.3d 459 (9th Cir.

7  1999) (quoting *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1234 (9th Cir. 1999).  Accordingly, at

8  best, defendants can be bound to the precise terms of their employment agreements, but nothing

9  more.  *Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 728 (9th Cir. 1983) ("[T]he traditional rule [is] that

10  injunctive relief should be narrowly tailored to remedy the specific harms shown by plaintiffs,

11  'rather than to "enjoin all possible breaches of the law."'") (quoting *Davis v. Romney*, 490 F.2d at

12  1370).  Here, the EIACA precludes only directly or indirectly "soliciting" employees

13  (*Declaration of Tracy Esposito*, Exhibit B ¶ 13), but Zynga asks the Court to enjoin Defendants

14  from "directly or indirectly, solicit[ing], induc[ing], recruit[ing] or encourage[ing] any Zynga

15  employee."  Proposed Order at 1.  Accordingly, the Court should deny Zynga's request.

16       **2.**     <u>Zynga has not demonstrated irreparable harm</u>

17       Zynga has also failed to demonstrate that it would suffer irreparable harm without the

18  injunctive relief it seeks.  Contrary to Zynga's arguments, the loss of an employee is a financial

19  loss that can be compensated through monetary damages; it is not irreparable.  *Pyro Spectaculars*

20  *North, Inc. v. Souza*, 861 F. Supp. 2d 1079, 1092 (E.D. Cal. 2012) (finding that "economic injury

21  is not considered irreparable, because monetary damages are available as an adequate remedy.").

22  Indeed, in order to calculate the monetary damages for such a loss, Zynga would merely have to

23  add up the costs to replace the lost employee (*e.g.*, recruitment costs, increase in salary needed to

24  attract new employee, etc.).

25       In arguing otherwise, Zynga relies on *Rent-A-Center, Inc. v. Canyon Television &*

26  *Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991), and argues that damage to its

27  "recruitment efforts" qualifies as irreparable harm.  Mot. at 25 ("damage to ongoing recruitment

28  efforts and goodwill, qualify as irreparable harm.")  That case, however, relied on *Kansas law*,

1    not California, which prohibits restraints on trade, encourages employee mobility, and recognizes

2    a California employer's rights to recruit broadly.  "California [in contrast] has a strong interest in

3    protecting the freedom of movement of persons whom California-based employers . . . wish to

4    employ."  *Application Grp., Inc. v. Hunter Grp., Inc.*, 61 Cal. App. 4th 881, 901, 72 Cal. Rptr. 2d

5    73 (1998); Cal. Bus. & Prof. Code § 16600.  Moreover, the "recruitment efforts" in *Rent-A-*

6    *Center*, however, referred to the ability of a University Football Team to recruit football players

7    not employees.  *Rent-A-Center*, 944 F.2d at 603 (citing *Regents of University of California v.*

8    *American Broadcasting Companies, Inc.*, 747 F.2d 511, 524 (9th Cir. 1984).  Accordingly, the

9    hypothetical harm to Zynga's "recruitment efforts" is not irreparable.

10        Zynga also argues that it is likely to suffer irreparable harm simply because the EIACA

11   states that irreparable harm will occur in the face of any violation.  Mot. at 24.  Although many

12   parties have attempted to make this very same argument, Courts overwhelming reject it, finding

13   that the Court must make its own independent finding of irreparable harm based on the particular

14   situation and this Court should do the same.  *E.g.*, *Int'l Ass'n of Plumbing & Mech. Officials v.*

15   *Int'l Conference of Bldg. Officials*, 79 F.3d 1153 (9th Cir. 1996) (Reversing District Court's

16   finding of irreparable harm because "while the district court concluded that IAPMO had suffered

17   irreparable injury, it did not make any factual finding of irreparable injury, nor did it specify the

18   nature of the injury which IAPMO had suffered.  Instead, the court based its conclusion solely on

19   a contractual provision in which ICBO conceded that IAPMO would suffer irreparable injury in

20   the event of a contract breach.  We believe this was error."); *Flextronics Int'l, Ltd. v. Parametric*

21   *Tech., Corp.*, No. C 13-0034 PSG, 2013 WL 5200175, at *8 (N.D. Cal. Sept. 16, 2013)

22   ("Contractual language alleging breach of the contract would cause irreparable harm, or that

23   money damages would be inadequate, standing alone, is not enough to satisfy the irreparable

24   harm requirement.")

25        Zynga cites two cases to support its argument, but those cases appear to be outliers based

26   on a line of cases from the Court of Chancery of Delaware.  Mot. at 24 (citing *Am. Impex Corp. v.*

27   *Int'l Ace Tex, Inc.*, 2009 WL 3963791, at *3 (C.D. Cal. Nov. 16, 2009) (relying on *True N.*

28   *Commc'ns Inc. v. Publicis S.A.*, 711 A. 2d 34, 44 (Del. Ch. 1997)) and *Cirrus Holding Co. v.*

1    *Cirrus Indus., Inc.*, 794 A. 2d 1191, 1209 (Del. Ch. 2001)).  Those Delaware cases are certainly

2    in the minority and, in any event, easily distinguishable because they do not deal with

3    employment contracts.  They are therefore different form the contract at issue here, the EIACA,

4    which is a one-sided employment contract of adhesion that Zynga's employees had no

5    opportunity to modify.  As at least one court has recognized, the Court should be much more

6    reluctant to honor such stipulations:

> Initially, the Court will address the Plaintiff's assertion that the irreparable harm
> element of the preliminary injunction standard is satisfied simply by the stipulation
> to that effect in the Agreement.  The Plaintiff points to several Delaware cases
> involving contractual stipulations in complex merger transactions in support of this
> view.  *See True North Communications Inc. v. Publicis S.A.*, 711 A. 2d 34, 44 (Del.
> Ch. 1997) (finding irreparable harm when contract contained stipulation); *Vitalink
> Pharmacy Services, Inc. v. Grancare, Inc.*, No. 15744, 1997 Del. Ch. LEXIS 116
> at *32 (Del. Ch. Aug. 7, 1997) (stipulation alone satisfies irreparable harm).
> However, under more rigidly scrutinized employment contracts, the Delaware
> courts have been more reluctant to apply such a stipulation.  *See Bernard Personnel
> Consultants, Inc.*, 1990 WL 124969, at *1-5 (not finding irreparable harm when
> personnel agency employment contract contained stipulation).   Therefore, the
> Court will look at the facts of this case and independently evaluate if the Plaintiff
> will suffer irreparable harm if injunctive relief is not granted.

15   *See Robert Half Int'l, Inc. v. Stenz*, 2000 WL 1716760, at *6 (E.D. Pa. Nov. 17, 2000).

16          **3.**     The Balance of Hardships Weighs Against An Injunction.

17          The balance of hardships weighs against an injunction here.  If Zynga's requested

18   injunction is issued here, Maietti and Barlach will be unable to directly or even indirectly

19   "encourage" Zynga employees to leave Zynga.  This effectively bars them from participating in

20   the hiring process at all, even when Zynga employees come to Scopely unsolicited.

21          Zynga argues that Scopely has the entire work force to hire from but Zynga only has its

22   own work force.  Mot. at 25.  That is simply not true.  The gaming market is a fluid market and

23   Zynga is just as capable of hiring new employees as Scopely is.

24          **4.**     An Injunction will not be in the public interest.

25          Issuing an injunction here will be counter to California's strong public interest in

26   employee mobility.  California courts have long given preference to employee mobility and the

27   public has a continued interest in avoiding restrictions to employer competition.  *See, e.g.,*

28   *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d at 255 (favoring employee mobility over business

DEFENDANTS' OPPOSITION TO APPLICATION FOR
TRO AND PRELIMINARY INJUNCTION
CASE NO. 16-CV-06855-VC

interests).  The injunction sought by Zynga is premised on its argument that a non-solicit agreement can preclude Maietti and Barlach from participating in hiring decisions, even when the potential employee initiated contact with them and genuinely wants to leave his current job.  Such an injunction harms those employees seeking employment with former colleagues because they may immediately disqualified based on the employers fear of legal recourse.

## V.     CONCLUSION

For the foregoing reasons, Defendants request that the Court deny Zynga's request for a temporary restraining order against Scopely and Maietti and Zynga's request for an order to show cause and preliminary injunction against Defendants.

Dated: December 5, 2016

ROBERT S. SHWARTS
MICHAEL D. WEIL
CATHERINE Y. LUI
Orrick, Herrington & Sutcliffe LLP


By: _____ */s/ Robert S. Shwarts*
ROBERT S. SHWARTS
Attorneys for Defendants

OHSUSA:766139247.3